**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARKET TRACK, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. _____ |
| | ) | |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| EFFICIENT COLLABORATIVE RETAIL | ) | |
| MARKETING, LLC. | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT**

Plaintiff Market Track, LLC ("Market Track") brings this Complaint against Defendant Efficient Collaborative Retail Marketing Company, LLC ("ECRM") for patent infringement, trade secret misappropriation, and deceptive trade practices, and states as follows:

**THE CONTROVERSY**

1.      For over 26 years, Market Track has been the leading provider of market intelligence solutions based on comprehensive analysis of advertising whose reputation for client focus is recognized industry-wide.  Market Track understands the critical components of retailer competitiveness:  share of voice, pricing, nature of offer and timing of placement.  This translates into the most comprehensive ad and e-commerce tracking and decision-support solutions available in the marketplace.  Market Track's success is validated by the more than 850 retailers, manufacturers and agencies that rely on its products and services to improve decisions, resulting in better business performance.  Market Track's proprietary technology enables it to provide data structure and tools that integrate multiple data sources and to use high-performance account teams focused on its customers' unique needs.

2.     Market Track has invested millions of dollars into developing web-based technology that allows its customers to obtain reports from a database of promotions and advertisements that is updated daily with information from over 200 geographic markets. Market Track has the rights and title to a key patent on this technology and is committed to enforcing its intellectual property and investment in research and development.

3.     Market Track has been very successful and has in-depth knowledge of the many industries it serves.  Using this experience, Market Track has developed confidential and proprietary trade secret information that allows it to provide the best value to its customers. Market Track carefully protects its trade secrets to prevent them from being misused by its competitors.

4.     Historically, ECRM has a very different business model than Market Track, hosting promotional events for retailers and manufacturers.  Recently, however, ECRM began offering an advertising comparison service as part of its MargetGate Application Suite, in direct competition with Market Track.  Rather than developing its own intellectual property, however, ECRM has slavishly copied proprietary technology that had already been developed at great expense (and effort) by Market Track.

5.     ECRM has engaged in a pattern of misappropriating Market Track's intellectual property, including Market Track's trade secret information concerning pricing and advertising comparison reporting formats.  It appears that ECRM has been deliberately targeting Market Track's customers in the marketplace using Market Track's own trade secret information.  For example, ECRM has consistently priced its competing copycat products and services at various precise percentages of Market Track's pricing – percentages so precise and consistent that the most probable explanation is that ECRM inappropriately obtained and misused Market Track's

highly confidential trade secret information concerning pricing. At least twice, former Market Track customers have acknowledged that ECRM improperly obtained trade secret reports developed by Market Track as part of ECRM's ongoing and improper copying of Market Track's intellectual property.

6.      Not content to undermine Market Track solely by consistent misuse of Market Track's intellectual property, ECRM has engaged in other forms of unfair competition. For example, ECRM's sales representatives have made numerous false statements – about the supposed financial health of Market Track and that clients allegedly have been abandoning Market Track – in an effort to improperly siphon business from Market Track under false pretenses.

7.      ECRM's infringement of Market Track's patent and trade secrets is damaging and will continue to damage  Market Track's business, causing irreparable harm, for which there is no adequate remedy at law, unless ECRM's wrongful acts are enjoined by this Court.

## THE PARTIES

8.      Market Track is a Delaware Limited Liability Company with its principal place of business at 233 S. Wacker Dr. Suite 1801, Chicago, IL 60606. Market Track, through its member, is a citizen of the States of Delaware and Illinois.

9.      On information and belief, ECRM is a Delaware Limited Liability Company with its principal place of business at 27070 Miles Road, Suite A, Solon, OH 44139. On information and belief, neither ECRM nor any of its members is a citizen of the States of Delaware or Illinois.

## JURISDICTION AND VENUE

10.     This is an action arising under the patent laws of the Unites States, Title 35 of the United States Code.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

11.     The Court has subject matter jurisdiction over Market Track's Illinois state law claims pursuant to 28 U.S.C. § 1332 because this is a dispute between citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.  In addition, the Court has supplemental jurisdiction over Market Track's state law claims pursuant to 28 U.S.C. § 1367(a).

12.     On information and belief, ECRM has engaged in substantial and continuous contacts with the State of Illinois and this District through its conduct of business, including infringing sales and offers for sale of its MarketGate product and services to customers within this District.  ECRM places infringing products and services into the stream of commerce – including by way of its website, www.ecrm.marketgate.com – with the knowledge that such products and services will be sold and used in this District.

13.     The Court has personal jurisdiction over ECRM pursuant to due process and/or the Illinois Long Arm Statute, IL 5/2-209.

14.     A substantial part of the events giving rise to Market Track's claims – including acts of patent infringement, trade secret misappropriation, and deceptive trade practices – occurred in this District.

15.     Venue is proper under 28 U.S.C. §§ 1391(b) and 1400(b).

## MARKET TRACK'S BUSINESS

16.     Headquartered in Chicago, Illinois, Market Track is the leading provider of market intelligence solutions based on comprehensive analysis of promotional advertising.  More than 850 customers from a wide variety of industries use the insights gained through Market Track's products and services to enhance their competitiveness.  The industries served by Market Track include pharmacy, health and beauty, beverage, consumer electronics, consumer packaged goods, perishables, home hardware, apparel, retail, manufacturing and many more.

17.     To stay competitive in the marketplace, verify and comply with reporting requirements, and make strategic decisions, companies want to track their own advertising and promotions and to know how their competitors are advertising and promoting competing products.  Market Track gathers data from advertisements covering more than 1,500 retailers in more than 200 geographic markets and stores it in database form.  The database is updated daily, and it contains information and images from advertisements in all major print sources, television, radio, billboards, media promotions, online promotions, and opt-in e-mails.  To be useful, the raw data must be distilled down to the relevant information in a meaningful way.  Market Track provides its customers with the tools to generate targeted reports – using formats developed by Market Track – and analysis of the specific products and markets of interest to them.  Customers can access these tools through a web-based interface and use them to generate customized reports.  As explained in a recent Gartner report identifying Market Track as one of five "cool" vendors in analytics in 2014, "[t]his enables clients to gain a better understanding of the competiveness of product pricing and to maximize the impact of their advertising strategy."[1]

---

[1] *See* Gartner, "Cool Vendors in Analytics, 2014," June 3, 2014, at 6; *see also* Ex. A, Press Release, "Gartner names Market Track as 'Cool Vendor in Analytics,'" June 30, 2014.

18.     Market Track's FeatureVision product enables users to access the Market Track database to search by category, brand, price range, retailer, market, date, or a number of other criteria.  FeatureVision also includes a digital archive of advertising images with specific report formats accessible to the user.  Reports can be downloaded, for example, in Excel, PowerPoint, Word, or PDF.

## MARKET TRACK'S PROTECTED INFORMATION

19.     Market Track has been providing market intelligence to its customers for over 26 years.  During that time, Market Track has built long-term relationships with many of its customers, developed in-depth knowledge of their industries, and tailored its products and services to meet their needs.  Market Track has invested heavily in developing proprietary products and services that allow its customers to gain the intelligence they need to remain competitive in their markets.  These investments include developing associated intellectual property, building the database and software for products such as FeatureVision, and designing its own proprietary reporting formats which can be accessed by the user.  Market Track has carefully priced its products and services to recoup on these investments while providing appropriate value to its customers.

20.     Market Track's pricing information is confidential.  Market Track protects its confidential pricing information through contractual non-disclosure agreements with its customers and prospective customers and by other means.  The identity of Market Track's customers is itself confidential and not publicly disclosed.

21.     The reports that Market Track provides to its customers are also confidential. Market Track's customers are contractually bound not to disclose Market Track's reports to others.  Market Track also marks its reports with a "confidential" designation.  Market Track

uses password protection to prevent its web-based products and services from being used without authorization, and Market Track meticulously requires its clients to obtain Restricted Use Agreements for any third parties with whom they seek to share its software and reports.

22.     Market Track maintains confidential customer lists, which include, *inter alia*, the date(s) when customers are due to renew their contracts with Market Track and associated pricing information.  Market Track protects its customer lists to prevent them from being obtained by its competitors.

## THE PATENT-IN-SUIT

23.     As of May, 2014, Market Track is the owner by assignment of all right, title, and interest in U.S. Patent No. 7,849,083 ("the '083 patent").[2]  The '083 patent is entitled "Automatic Creation of Output Files from Images in Database" and lists Daniel G. Fitzpatrick as the inventor.  The '083 patent claims priority to provisional application No. 60/558,007, filed on March 31, 2004.  A true and correct copy of the '083 patent is attached hereto as Exhibit B.

24.     The original assignee of the '083 patent, Advertising Processing Inc., merged into Market Track in 2004.  Since that time, Market Track has been the exclusive licensee of the inventions disclosed in the '083 patent with regard to the ad tracking space.

25.     As set forth in the '083 patent, it describes and claims a system and method for automatically creating a stand-alone output file from a database containing images – specifically advertising images.  FeatureVision is a commercial embodiment of one or more claims of the '083 patent.

26.     Market Track has listed the '083 patent on every page of its FeatureVision web portal and on its public website.

---

[2] A copy of the '083 patent is attached as Exhibit B.

## GENERAL ALLEGATIONS

27.     ECRM started its business as a host of category-specific collaborative events for retailers and manufacturers.  The events were designed to streamline the business process between retail buyers and their suppliers.  On information and belief, the promotional-mixer business is still ECRM's primary business today.

28.     Until recently, ECRM was not in the business of providing market intelligence based on comprehensive analysis of promotional advertising.  Rather, ECRM's business focused on event planning services and software that helped to facilitate interaction between buyers and their suppliers.

29.     Apparently recognizing the tremendous value in the ad tracking space provided to customers by Market Track, ECRM recently decided to enter that space.  But rather than doing so legitimately by making the types of monetary and technological investments to develop the necessary software tools, databases, and software on its own, ECRM instead copied Market Track.

30.     Over time, the ad comparison features of ECRM's MarketGate Application Suite have become more and more similar to Market Track's products.  Today, ECRM's MarketGate includes features that are nearly identical to those developed by Market Track and patented in one or more claims of the '083 patent.

31.     The reports available using ECRM's software are nearly identical – in format and content – to Market Track's proprietary and confidential reports that it has been providing to customers for years.  This is not a coincidence.  To the contrary, ECRM has misappropriated confidential Market Track reports and, on information and belief, used those materials to blatantly copy confidential and proprietary features developed by Market Track.

32.     More than once, ECRM has received Market Track's proprietary and confidential ad tracking reports from Market Track's customers who had a contractual obligation not to share that information.  Those reports contained confidential and proprietary Market Track information concerning the format, content, and metrics of such reports.

33.     On information and belief, ECRM deliberately copied the format and content of Market Track's confidential reports in an effort to attract Market Track's customers by offering apparently similar products and services.

34.     Market Track possesses highly confidential information regarding customer pricing.  The FeatureVision service can be customized to fit the number of users required by a customer, to facilitate their business goals, and to maximize its value for the customer.  Market Track accordingly employs dynamic pricing to deliver its product and myriad services to customers, and its pricing information therefore is treated as highly confidential.

35.     ECRM rarely competes with Market Track for new customers – *i.e.*, those employing ad tracking technology for the first time.  Rather, ECRM almost exclusively competes for Market Track's existing customers.  Not only is that economically irrational, the specific manner in which ECRM competes highlights ECRM's misappropriation and misuse of Market Track's highly confidential pricing information.

36.     Specifically, on dozens of recent occasions, ECRM has approached existing Market Track customers and offered pricing for its infringing MarketGate product and service at a precise percentage of Market Track's pricing.  Due to the fact that ECRM's pricing has been at such remarkably precise percentages of Market Track's pricing, such behavior cannot be reasonably attributed to chance or independent pricing.  On information and belief, ECRM's

pricing was predicated on the confidential pricing information that it obtained from Market Track's customers or some other illicit source.

37.     ECRM has been approaching Market Track's customers at just prior to the time when their existing contracts with Market Track are up for renewal.  This renewal information is kept as part of Market Track's confidential and protected customer lists.  As with its pricing information, ECRM could not have known when these contracts were up for renewal without having obtained this highly confidential information from Market Track's customers or some other illicit source.

38.     ECRM's sales representatives also have made disparaging statements about Market Track's business to Market Track's current and/or prospective customers.  ECRM's sales representatives have said that Market Track is a private equity backed company with substantial debt that allegedly is losing its customers – with the implication that Market Track is unlikely to stay in business – in an effort to take business away from Market Track.  For example, ECRM's sales representatives have told prospective customers that ECRM had over 100 clients switch to its service from Market Track.  These statements are false and misleading.

## COUNT I

### (Infringement of the '083 Patent)

39.     Market Track realleges and incorporates by reference herein the allegations of Paragraphs 1 through 38 above.

40.     ECRM has infringed and continues to infringe, for example, at least claims 1, 34 and 43 of the '083 patent under 35 U.S.C. § 271(a) by making, using, selling, and/or offering for sale the ECRM MarketGate Application Suite in the United States.  In particular, the ad

comparisons feature of the ECRM MarketGate Application Suite infringes the patented invention.

41.     ECRM has actively induced and continues to induce infringement by others, including its customers, of the '083 patent under 35 U.S.C. § 271(b) by, among other things, manufacturing, selling, and/or offering for sale within the United States the ECRM MarketGate Application Suite, including, for example, Advantage Sales and Marketing.   For example, ECRM induces infringement of at least claim 1 of the '083 patent by instructing its customers to use the ad comparisons feature of the MarketGate Application Suite to have that software/system process a query against a database of advertising images, select at least one image from the results of the query, select an output file type and delivery method, automatically create at least one stand-alone output file, and send the output file to a destination using the selected delivery method.  ECRM has actual knowledge of the '083 patent since at least the time of service of this Complaint.   ECRM has known that its actions would induce actual infringement by its customers.   ECRM has specifically intended for its customers to use the ECRM MarketGate Application Suite in an infringing manner.   For example, ECRM instructs its customers to use its MarketGate software in an infringing manner and provides user manuals, which are publicly available on its website, with such information.

42.     ECRM has contributed to and continues to contribute to the infringement by others, including its customers, of the '083 patent under 35 U.S.C. § 271(c) by, among other things, selling and offering for sale within the United States its MarketGate Application Suite. The ad comparisons feature of ECRM's MarketGate Application Suite constitutes a material part of the invention of the '083 patent, and ECRM knows that it is especially made and adapted for use in a way that infringes the '083 patent.  For example, ECRM contributes to the infringement

of at least claim 1 of the '083 patent by selling software that enables ECRM customers to utilize ECRM's system to have it process a query against a database of advertising images, select at least one image from the results of the query, select an output file type and delivery method, automatically create at least one stand-alone output file, and send the output file to a destination using the selected delivery method. The ad comparisons feature of ECRM's MarketGate software is not a staple or article of commerce suitable for substantial noninfringing use. ECRM's customers – including, for example, Advantage Sales and Marketing – directly infringe the '083 patent when, among other things, they use the ad comparisons feature to generate advertising reports, either on demand or on a periodic basis.

43.     Market Track complies with the notice requirements of 35 U.S.C. § 287, including by listing the '083 patent on its public website and FeatureVision portal.

44.     ECRM has visited Market Track's website, which provides notice of the '083 patent, on multiple occasions. On information and belief, ECRM continues to visit Market Track's website and has knowledge of the '083 patent. Therefore, ECRM's past and continuing infringement of the '083 patent is deliberate and willful. As a result, this is an exceptional case that warrants an award of treble damages and attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

45.     Market Track has no adequate remedy at law, because ECRM is using Market Track's patented technology to directly compete against it.

46.     As a result of ECRM's patent infringement, Market Track is entitled to preliminary and permanent injunctive relief. If not enjoined, ECRM's conduct will continue to cause irreparable harm to Market Track's business.

## COUNT II

### (Misappropriation of Trade Secrets)

47.     Market Track realleges and incorporates by reference herein the allegations of Paragraphs 1 through 38 above.

48.     Market Track's pricing information, customer lists, and reports, among other information, are proprietary and confidential.  Market Track has taken and continues to take reasonable efforts to keep its proprietary and confidential information secret, and Market Track derives economic value and competitive advantage from such information not being known or used by its competitors or others.  As recently reported by Gartner, "Market Track's ability to digitize data efficiently and store it in a large database for effective use and reporting represents the key value of its service."[3]  Market Track protects this value by keeping its proprietary and confidential information secret.

49.     Market Track's proprietary and confidential information qualify as trade secrets protected by the Illinois Trade Secrets Act, 765 ILCS 1065.

50.     On information and belief, ECRM has misappropriated Market Track's trade secrets in violation of 765 ILCS § 1065 and used those trade secrets for its own benefit to improperly profit at Market Track's expense by, *inter alia*, siphoning existing customers away from Market Track.  ECRM obtained Market Track trade secret reports from at least two of Market Track's customers who were contractually obligated not to share that information. ECRM knew or had reason to know that Market Track's reports were confidential and had been obtained without Market Track's consent and in breach of contract.

---

[3] *See* Gartner, "Cool Vendors in Analytics, 2014," June 3, 2014, at 5; *see also* Ex. A, Press Release, "Gartner names Market Track as 'Cool Vendor in Analytics,'" June 30, 2014.

51.     On information and belief, ECRM used Market Track's trade secrets to approach and attract Market Track's customers based on a misuse of that confidential pricing information. ECRM has consistently priced its products and services at precise percentages of Market Track's prices in a way that cannot be reasonably attributed to chance or independent pricing. Rather, on information and belief, ECRM's pricing must have been based on the trade secret information it had misappropriated from Market Track.

52.     On information and belief, ECRM also designed its own reports to mirror Market Track's trade secret reports, which it had misappropriated. ECRM's reports include nearly-identical content and use a similar format to Market Track's reports. On information and belief, ECRM's reports were designed to lure away Market Track's customers by offering facially similar products.

53.     On information and belief, ECRM has misappropriated Market Track's customer lists and is using them to target Market Track's customers at points in time just prior to when their contracts are up for renewal. ECRM has exhibited a pattern of approaching Market Track's existing customers during this critical time period, when its customers are potentially vulnerable to being lured away by ECRM's copycat products and services.

54.     Market Track has sustained and will continue to sustain damages, and ECRM has been and will continue to be unjustly enriched, as a direct result of ECRM's misappropriation of Market Track's trade secrets.

55.     On information and belief, ECRM's misappropriation of Market Track's trade secrets has been and continues to be willful and malicious.

56.     Market Track has no adequate remedy at law.

57.     As a result of ECRM's wrongful conduct, Market Track is entitled to preliminary and permanent injunctive relief.  If not enjoined, ECRM's conduct will continue to cause irreparable harm to Market Track's business.

## COUNT III

### (Deceptive Trade Practices)

58.     Market Track realleges and incorporates by reference herein the allegations of Paragraphs 1 through 57 above.

59.     On information and belief, ECRM has made false or misleading statements regarding Market Track's business, including that Market Track is losing customers and will be unable to sustain its business.  On information and belief, ECRM made these statements to support its efforts to lure away Market Track's existing and prospective customers, even though they were not true.

60.     ECRM's false and misleading statements about Market Track violate the Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS 510.

61.     On information and belief, ECRM willfully engaged in these deceptive trade practices.

62.     As a result of ECRM's wrongful conduct, Market Track is entitled to preliminary and permanent injunctive relief.  If not enjoined, ECRM's conduct will continue to cause irreparable harm to Market Track's business.

## PRAYER FOR RELIEF

**WHEREFORE**, Market Track respectfully requests that the Court enter judgment in its favor and against ECRM on this Complaint as follows:

A.      A judgment that the '083 patent has been and continues to be infringed by ECRM;

B.      A judgment that ECRM has violated the Illinois Trade Secrets Act;

C.      A judgment that ECRM has violated the Illinois Consumer Fraud and Deceptive Trade Practices Act;

D.      A preliminary and permanent injunction enjoining ECRM and its officers, agents, representatives, assigns, licensees, distributors, employees, related entities, and all those in privity or acting in concert with ECRM from:

     i.      further infringing, inducing, or contributing to the infringement of the '083 patent;

     ii.      using, marketing, selling, licensing, offering to sell, or otherwise distributing the ECRM MarketGate Application Suite;

     iii.      threatened or actual misappropriation of Market Track's trade secrets;

     iv.      disparaging Market Track's goods, services, or business by making false or misleading statements of fact;

E.      An order compelling ECRM to:

     v.      return all Market Track trade secret or confidential information;

     vi.      disclose all entities to which ECRM provided or otherwise disclosed Market Track's trade secret information;

     vii.      disclose all entities from which ECRM obtained Market Track's trade secret information;

F.      An award of monetary damages sufficient to compensate Market Track for ECRM's patent infringement and trade secret violations pursuant to at least 35 U.S.C. § 284 and 765 ILCS 1065/4, including prejudgment and post-judgment interest;

G.      An accounting and/or supplemental damages for all damages occurring after any discovery cutoff and through the Court's decision regarding the imposition of a permanent injunction;

H.      An award to Market Track of treble damages incurred as a result of ECRM's willful infringement of the '083 patent, pursuant to at least 35 U.S.C. § 284, including prejudgment interest on such fees ;

I.      An award to Market Track of attorneys' fees based on this being an exceptional case pursuant to 35 U.S.C. § 285, including prejudgment interest on such fees;

J.      An award to Market Track of exemplary damages and its attorneys' fees incurred as a result of ECRM's willful and malicious misappropriation of Market Track's trade secrets, pursuant to at least 765 ILCS 1065/4-5.

K.      An award to Market Track of the costs and/or expenses of this suit and its attorneys' fees incurred as a result of ECRM's willful engagement in deceptive trade practices, pursuant to at least 815 ILCS 510/3; and

L.      Any other relief that the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Market Track respectfully demands a jury trial on all issues properly triable to a jury.

Dated:  June 30, 2014                                        Respectfully submitted,


*/s/ Kenneth G. Schuler*
Kenneth G. Schuler (ARDC No. 6226036)
Aaron Perez-Daple (ARDC No. 6304990)
William Katt (ARDC No. 6300159)
LATHAM & WATKINS LLP
330 North Wabash, Suite 2800
Chicago, IL  60611
Ph:  (312) 876-7700
Fx:  (312) 993-9767

Maximilian A. Grant (ARDC No. 6237213)
LATHAM & WATKINS LLP
555 Eleventh Street, NW Suite 1000
Washington, DC 20004
Ph:  (202) 637-2200
Fx:  (202) 637 2201

Attorneys for Market Track, LLC

# EXHIBIT A

**NEWS**

**FOR IMMEDIATE RELEASE**

Contact(s): Stefan Pollack/Daniel Atwater
The Pollack PR Marketing Group
(310) 556-4443
spollack@ppmgcorp.com
datwater@ppmgcorp.com

**GARTNER NAMES MARKET TRACK AS "COOL VENDOR IN ANALYTICS"**

**Market Track, A Competitive Intelligence Firm, Provides Multi-Channel Data And Analytics Solutions For Retailers, Manufacturers and Advertisers**

**CHICAGO, (June 30, 2014)** — Market Track, LLC, the leading provider of promotion, real-time eCommerce, and pricing intelligence solutions in North America, announced today that it has been named amongst a select group of five companies in the Gartner, Inc. "Cool Vendors in Analytics, 2014" (1) report. Gartner, the world's leading information technology research and advisory company, releases the report annually, which is well-recognized for identifying innovative, impactful and intriguing companies.

Market Track continues to offer actionable insights, trends and 'best in class' solutions for targeted business results, as the speed of retail industry activity continues to increase and change.

Wayne Mincey, CEO of Market Track said, "We believe being recognized by Gartner as a Cool Vendor in Analytics further validates the business value of providing a comprehensive view of what is influencing shoppers and buyers through advertising, promotional, pricing and e-commerce data." Adds, Mincey, "Competition for the shopper has never been tougher and our technology innovations are providing clarity on the competitive landscape across all critical media channels so that clients can take actions that directly impact their results in real time."

Today more than 850 clients, including global Fortune 500 retailers, manufacturers and brands, as well as 75 of the nation's top 100 advertisers depend on Market Track to help maximize sales and profitability, with actionable data and insights into advertising spend comparisons, competitive promotions and multi-channel pricing.

Click "Cool Vendors in Analytics, 2014" to access the full report by Gartner.

**About Market Track**
Headquartered in Chicago, Illinois, Market Track is the leading provider of subscription-based advertising and pricing intelligence solutions in North

America. Through its Market Track brand, which focuses on trade and promotional advertising, pricing and eCommerce activity and Competitrack, which focuses on brand advertising, the company provides the most comprehensive coverage of key media channels available. Offered via web-based software-as-a-service platforms, Market Track's solutions enable advertisers, agencies, retailers and manufacturers of consumer goods to efficiently monitor and analyze causal data, creative execution and ad spending to maximize the value of their marketing campaigns. Clients use Market Track's capabilities to determine how competing retailers, products and brands are being advertised, priced and promoted both in-store and online. The Company's granular creative assets and data covers nearly every retail trade class, product category and media channel. For more information, please visit, www.markettrack.com.


**Disclaimer:**

Gartner does not endorse any vendor, product or service depicted in its research publications, and does not advise technology users to select only those vendors with the highest ratings. Gartner research publications consist of the opinions of Gartner's research organization and should not be construed as statements of fact. Gartner disclaims all warranties, expressed or implied, with respect to this research, including any warranties of merchantability or fitness for a particular purpose.

 (1) Gartner "Cool Vendor in Analytics 2014" by Gareth Herschel, W. Roy Schulte, Vishal Tripathi, Neil Chandler, David Edward Ackerman, June 3, 2014.


# # #

# EXHIBIT B



US007849083B2

(12) **United States Patent**

Fitzpatrick

(10) Patent No.: **US 7,849,083 B2**

(45) Date of Patent: **Dec. 7, 2010**

(54) **AUTOMATIC CREATION OF OUTPUT FILE FROM IMAGES IN DATABASE**

(75) Inventor: **Daniel G. Fitzpatrick**, Middle Grove, NY (US)

(73) Assignee: **Advertising Processing, Inc.**, Paradise Valley, AZ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/094,506**

(22) Filed: **Mar. 30, 2005**

(65) **Prior Publication Data**

US 2005/0262131 A1     Nov. 24, 2005

**Related U.S. Application Data**

(60) Provisional application No. 60/558,007, filed on Mar. 31, 2004.

(51) **Int. Cl.**
*G06F 7/00*     (2006.01)
(52) **U.S. Cl.** ........................ **707/732**; 707/705; 707/722; 707/758
(58) **Field of Classification Search** ..................... 707/1, 707/2, 3, 10, 100, 4, 104.1, 999.001, 999.002, 707/999.003, 999.004, 999.107, 705, 722, 707/758, 732
See application file for complete search history.

(56) **References Cited**

PUBLICATIONS

Bott et al., "Special Edition Using Microsoft Office 2000", Copyright 1999, Que Corporation, pp. 1-41.*
Microsoft Corporation, Microsoft PowerPoint 2000, Copyright 1999, Product ID 50637-752-3126295-02661.*
Rutledge et al., "Special Edition Using Microsoft PowerPoint 2000", Copyright 1999, Que Corporation, pp. 1-22.*
Jerry Honeycutt, Windows 2000 Professional, Apr. 18, 2000, Sams, Chapter 4. Integrated Searching.*
Jim Boyce, Windows 2000 Quick Fixes, Dec. 2000, O'Reilly, Section 4.13. Add a new option to the Send to menu.*
Rutledge et al., Special Edition Using Microsoft PowerPoint 2000, May 6, 1999, Que, Chapter 2. Creating a Basic Presentation and Chapter 18. Integrating with Office 2000.*
Bill Camarda, "Special Edition Using Microsoft Office Word 2003", Dec. 2003, Que, 14 pages.*

* cited by examiner

*Primary Examiner*—Hung Q Pham
(74) *Attorney, Agent, or Firm*—Wayne F. Reinke, Esq.; Heslin Rothenberg Farley & Mesiti P.C.

(57) **ABSTRACT**

A query is run against a database with information related to images. Images of interest are selected for inclusion in an output file, for example, a presentation application file. Configuration and other choices are made regarding the output file, and any other information needed to generate the output file is gathered. When all the necessary information is available, an output file is automatically generated and delivered to a user. The output file includes the selected images and identifying information about the images.

**51 Claims, 7 Drawing Sheets**



# FIG.1





FIG.2





**FIG.5**

500

```
┌─────────────────────────┐
│      RUN QUERY          │──── 502
└─────────────────────────┘
            │
            ▼
┌─────────────────────────┐
│    SELECT IMAGE(S)      │──── 504
└─────────────────────────┘
            │
            ▼
┌─────────────────────────┐
│    REQUEST OUTPUT       │──── 506
│        FILE             │
└─────────────────────────┘
            │
            ▼
┌─────────────────────────┐
│   INDICATE OUTPUT       │──── 508
│      OPTIONS            │
└─────────────────────────┘
            │
            ▼
┌─────────────────────────┐
│      GATHER             │──── 510
│  INFORMATION FOR        │
│    OUTPUT FILE          │
└─────────────────────────┘
            │
            ▼
┌─────────────────────────┐
│   GENERATE OUTPUT       │──── 512
│        FILE             │
└─────────────────────────┘
            │
            ▼
┌─────────────────────────┐
│   DELIVER OUTPUT        │
│        FILE             │──── 514
└─────────────────────────┘
```

## FIG.6



700
File Edit View Favorites Tools Help
Address
Google
Search Web
Page Rank
37 Blocked
AutoFill
Options
Links
Subscription Portal
Reset all selections on this page to the default values
Available Subscriptions:
Select A Subscription Here
Save Subscriptions As:
Complete The Following Steps To Register A Subscription That Will Automatically Deliver AdView Reports To Specified Recipients
1. Select Your Data - First, select the Saved Queries, and/or Query Groups, that will retrieve the data to be included in your Subscription.
Available Saved Queries:
Comparative Query
Demo 2
Save Selected Queries As Group Named:
Available Saved Query Groups:
2. Select Your Report Format(s) - Then, select the Report(s), and/or Report Group(s), to be used in this Subscription (for Product Detail queries only)
Available AdView Reports:
Product Detail Report
Ad Calendar By Brand/Account
Monthly Trend By Category/Brand
Qtly Trend By Brand/Account
Save Selected Reports As Group Named:
Available Report Groups:
Monthly Top Line
Mktg Top Line
Include "Filter" links in Product Detail Report(s) In Excel.
Save this record set so that it can be viewed later on the site.
Include "Drill To Detail" links in Summary report(s) In Excel.
Send Excel Report(s) As A WinZip File To Reduce File Size.
3. Report Recipients - Then, select the email addresses and/or the email Groups, that this Subscription should be sent to.
Available Email Addresses:
Save Selected Emails As Group Named:
Available Email Groups:
pat
test
Add To Available Email Addresses:
4. Delivery Schedule - Then, Select The Specific Dates And/Or Schedule On Which This Subscription Should Be Sent. Data Should Be Entered As mm/dd/yy.
Send On:
And Then Every:
Select
Units:
Enter Network Password
Please type your user name and password
Site www.newadview.com
Realm www.newadview.com
User Name
Password
Save this password in your password list
OK
Cancel
Applet MyApplet
Unknown Zone
Start
702
704
706
708
710
712
714
716

FIG. 7

US 7,849,083 B2

**1**

## AUTOMATIC CREATION OF OUTPUT FILE FROM IMAGES IN DATABASE

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of U.S. Provisional Application No. 60/558,007, filed Mar. 31, 2004, which is hereby incorporated herein by reference in its entirety.

### BACKGROUND OF THE INVENTION

1. Technical Field

The present invention generally relates to presenting database information. More particularly, the present invention relates to the automatic creation of an output file including at least one image and identifying information therefor obtained from a database.

2. Background Information

Databases contain many different types of information, including information related to digital or digitized images. Databases can contain images and/or pointers to images that are stored externally to the database, and/or information about the images. A wide variety of industries utilize databases related to images. For example, retailers, manufacturers, brokers, ad agencies and other companies use images of products and services that are offered for sale in advertisements. Many companies have found it useful to analyze advertising images, typically in digital or digitized form (making it possible to include them or pointers to them in a database), to gain insight into how different approaches affect sales of a given product (or service) or group of products, to understand how the volume and type of advertising for one brand or product compares to that of other brands and products, to verify that advertisements have been presented for review by consumers so that payments that are contingent on such advertising placements can be made, to review trademark usage by various advertisers, and for many other purposes.

Typically, advertising image databases contain or reference digital representations of advertising images, along with varying degrees of information about the advertising images. As with many databases, queries can be run against the data to retrieve specific information which contains references to the images or retrieve the images themselves. While it can be helpful to review the results of such queries on-line, there is also a significant need for offline review and/or sharing of query results or portions thereof. This is typically accomplished by a user copying individual images from the database to a local workstation or personal computer where the image can then be manipulated locally. This manipulation frequently takes the form of a user inserting the image into a word processing program or a presentation program, such as Microsoft PowerPoint or Adobe Acrobat, resizing the image to fit properly within the allocated space, and manually inserting identifying information related to the image so that others who subsequently view the image can understand the source and relevance of the image. When multiple images are inserted in such programs, additional time must be devoted to creating a template to organize the way the images and related identifying information are presented. This is a very time consuming and inefficient process, which significantly reduces the extent to which images retrieved from databases are used in word processing and presentation programs.

Thus, a need exists for a flexible and efficient method of creating documents, and other ways of presenting information, that enable people to view images and identifying information related thereto that have been retrieved from a database, offline from the database.

### SUMMARY OF THE INVENTION

Briefly, the present invention satisfies the need for a flexible way to view image query results or portions thereof offline from the database, by automatically creating, in response to a request, output files that include one or more images and identifying information for the images in a multitude of formats and layouts. These output files can then be viewed offline and/or shared with others.

In accordance with the above, it is an object of the present invention to provide the automatic creation of at least one output file including at least one image and identifying information therefor.

The present invention provides, in a first aspect, a method of creating output file from images. The method comprises processing a query by a processor against information in a database regarding a plurality of images and generating query results. The method also comprises selecting at least one image from the generated query results, selecting an output file type, and selecting a delivery method. The method further comprises automatically creating at least one stand-alone output file with the file corresponding to the selected output file type, wherein the at least one created stand-alone output file comprises the at least one selected image and preexisting identifying information for the at least one selected image, and sending the at least one created stand-alone output file to a destination corresponding to the selected delivery method.

System and computer program products corresponding to the above-summarized methods are also described and claimed herein.

These, and other objects, features and advantages of this invention will become apparent from the following detailed description of the various aspects of the invention taken in conjunction with the accompanying drawings.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** depicts one example of a system in accordance with the present invention.

FIG. **2** depicts one example of a central query page.

FIG. **3** depicts one example of query results **300** shown as images of entire pages in ads.

FIG. **4** depicts one example of a page for choosing one or more templates to be used to create the requested output file(s).

FIG. **5** is a flow diagram for one of example of automatic creation of an output file including at least one image and identifying information therefor.

FIG. **6** is a flow diagram for a more detailed example of automatic creation of an output file including at least one image and identifying information therefor.

FIG. **7** depicts one example of a page for creating a subscription.

### DETAILED DESCRIPTION OF THE INVENTION

FIG. **1** depicts one example of a system **100** for presenting database information, in accordance with the present invention. System **100** comprises a conventional user computer **102**, which can take many different forms. As one example, user computer **102** comprises a conventional housing **104** within which is at least one processor **106**, and at least one storage device **108**. In this example, user computer **102** also comprises a monitor **110**, and two input devices, a keyboard

US 7,849,083 B2

3

112 and a mouse **114**. The computer runs some type of operating system, e.g., some version of Microsoft Windows. The user computer could instead be a notebook computer, handheld computer, etc. and the components could be different, for example, a different pointing device, multiple processors, multiple storage devices, storage in another location, just to name a few.

System **100** further comprises, in this example, a conventional web server **116** that communicates with computer **102** over a global communications network **118** (e.g., the Internet) via, for example, TCP/IP (a standard communications protocol). A database server **120** communicates with web server **116** over a network **122**. In one example, the network is a local area network. In another example, the network is a wide area network. In yet another example, the network is a global communications network (e.g., the Internet). Database server **120** accesses image storage **124** over a network **128**. Image storage **124** is, for example, another server that simply acts as storage for the images.

It will be understood that system **100** is merely one example of a system in accordance with the present invention. Many different configurations of such a system are possible. For example, there need not be a web server at all, the database server **120** and computer **102** may communicate directly over a network, such as, for example, a local area network. In addition, any of the networks noted in the example could be wireless or wired. Still further, image storage **124** need not be separate from database server **120**; they could be part of the same physical machine. Similarly, web server **116** need not be physically separate from database server **120**. As yet another example, a user could access database server **120** directly, rather than from user computer **102**.

Database server **120** runs a database program, for example, Microsoft SQL Server, and comprises, for example, a database **126** of information related to advertising images. The information includes, for example, pointers to page images stored in image storage **124**, pointers to images of portions of page images stored in image storage **124**, pointers to images of web page ads stored in image storage **124**, pointers to images of portions of web page ads stored in image storage **124**, pointers to additional sizes of any of the images described previously, and information about the images. Page images are images of entire pages that contain advertisements that might be published, for example, in a magazine, as part of a local newspaper, or on a web page. The database could, instead of pointers to the advertising images hold the images themselves. In that case, image storage **124** would not be necessary, though it could be used as a backup for the database.

The information about the advertising images may include any or all of, for example, the geographic market(s) in which the ad appeared, the date(s) the ad appeared, the advertiser that placed the ad, what type of media the ad appeared in, a description of one or more products shown, the brand(s), the category or categories for the product(s), the advertised prices for the product(s), any restrictions on the offer, and additional information of this sort. Other types of images would have different relevant identifying information. As with most databases, queries can be run against the information in the database.

One example of the operation of the present invention will now be described with reference to system **100** of FIG. **1**. Initial queries against database **126** are run from a central query page **200**, shown in FIG. **2**. The user interface for making queries can be implemented in many different ways, FIG. **2** merely being one example. The central query page is presented in this example as a web page to a user of computer

4

**102** in a web browser on monitor **110**. The central query page comprises a plurality of scrollable boxes (e.g., box **202**), one for each type of information in the database. For example, box **202** relates to Account, and includes a list of retailers included in the database and a choice to select all retailers listed in that box. A user makes one or more choices in each box using, for example, keyboard **112** and/or mouse **114**.

A drop-down box **206** includes a choice for how the query results will be presented to the user. For example, the results can be shown as page images. As another example, the results can be shown as product images; that is, a portion of a page image showing, for example, one or more products or services. As still another example, the user can choose to skip viewing the results of the query at this time, and instead choose to have the results emailed, or have an output file created in a particular format. For example, the output file could be created as a presentation application file (e.g., Microsoft PowerPoint), as a spreadsheet file (e.g., Microsoft Excel), as a word processing file (e.g., Microsoft Word), or as an image file (e.g., in Adobe PDF format) for use in an imaging application (e.g., various Adobe products), to name only a few.

A series of action buttons **210** cause some action to take place. For example, action button **212** instructs that the query should be run and the results shown (on display **110**) in accordance with the choices made. As another example, action button **214** instructs to run the query and email the results. This button can be used in conjunction with drop-down box **206** to have the query results emailed as page or product images, for example. As still another example, action button **216** instructs to run the query, but stay on the central query page. As yet another example, action button **218** instructs to show the results of the last query that was run by the user during the current session.

FIG. **3** depicts one example of query results **300** shown as page images (e.g., page image **302**), and how the query results can be used to create an output file. In some manner, one or more page images can be selected for further use or to be included in an output file(s). For example, simple check boxes (e.g., check box **304**) can be used for selecting images, or the user can use an icon **305** in the toolbar to select all images After one or more images are selected, an indication of which type of output file is made in some manner. For example, a number of icons **306** are provided along the top for various purposes, including indicating the type of output file. For example, a user might click on an icon **308** to indicate the type of output file as a presentation application file. In this specific example, an icon for Microsoft PowerPoint is provided. After clicking on icon **308**, a popup box **310** appears, asking the user to choose what types of images to save for use in creating the output file; in this example, page images, product images or both.

In addition to making the choice for the type(s) of image, unless the presentation application output file is provided in only one layout, the user also needs to indicate the layout of the images on the slides. In the present example, the user is asked to choose from among a multitude of predefined layout templates. Alternatively, the user could be allowed to create a custom layout template, as another example. If a different type of output file were chosen, different choices would be presented. Returning to the present example, FIG. **4** depicts a screen **400** showing choices in a top row **402** for example templates that use page images. For example, one possible choice is template **404**, using full size images, one per slide, in either landscape or portrait orientation. As another example, template **406** uses four mid-size page images per slide in either landscape or portrait orientation. As still

**5**

another example, template **408** uses 10 thumbnail-size images per slide. In a bottom row **410**, example choices are given for partial-page images (i.e., product images or custom images). For example, template **412** places four such images on each slide, while template **414** places 12 partial-page images per slide.

Further template examples include combining multiple images of one or more individual products, combining page images from one or more advertisements (e.g., two pages, four pages or more), combining related or unrelated product and page images (e.g., a product image and page in which it is included), combining one or more product and/or page images with data pertaining to sales of one or more products and/or services therein or sales resulting from an advertisement.

The bottom **416** of FIG. **4** shows a number of other choices that can be made. For example, a user can choose to have only product image thumbnails **418**, saving the selections made, so they can be viewed again later **420**, deleting duplicate product images **422**, and combining all selected images into one report **424** (in one embodiment, the default is that each template chosen results in a separate output file). In addition, the user can choose to send the output file(s) attached to an email **426**, send an email with a link to download the output file(s) **428**, or download the output file(s) now **430** (e.g., via web server **116** in FIG. **1**). A name **432** can be specified by the user to be used to name the output file(s), as well as the text to be used in the email subject line **434**.

FIG. **5** is a flow diagram **500** for one example of automatic creation of an output file including at least one image and identifying information therefor, described with reference to the system **100** of FIG. **1**. The relevant identifying information for an image will vary depending on the type of image, and the needs of the users. In the present example, the images are advertising images. The users of such images typically need to know, at a minimum, the date(s) the image appeared publicly and an indication of where it appeared, for example, as a supplement in a particular newspaper or on a particular web site. It could also include, for example, any or all of the information described with respect to database **126** in FIG. **1**.

In some manner, either initiated by a user or in an automated fashion under a subscription previously requested by a user, a query is run **502** against database **126**. Based on this query, one or more images are selected **504** for further use or for use in automatically creating an output file in response to a request therefor. Once at least one image is selected, a request is made **506**, in some manner, for an output file for the selected image(s) and identifying information therefor. The request can be made by a user during the present session, or can be part of an automated subscription that periodically updates the query results. When initiated by a user during the present session, the request can come at various points during the session. One example was described with respect to FIG. **3**. Output options are made **508** by the user, again either currently or previously, such as, for example, the size of image(s) to use, the delivery method and the template (where applicable, depending on the type of output file), as explained in detail above. Database server **120** then begins gathering **510** the information necessary to create the requested output file. Once all the necessary information has been gathered, the requested output file is generated **512** and delivered **514**, in accordance with the output options indicated.

A subscription is essentially an automated database query according to variables chosen by a user. For example, one or more previously executed queries and/or query groups are configured according to format, recipient and schedule choices made by the user. FIG. **7** depicts one example of a

**6**

page **700** for creating a subscription. A user first chooses **702** the data to be included in the subscription, for example, saved queries **704** and/or query groups. Next, the user selects **706** the report format(s) and/or format group(s) to be used for the subscription, with various suboptions **708** also available. The user then indicates **710** who the recipients are, by selecting email addresses and/or email groups that the output of the subscription will be automatically sent to. The user also indicates **712** what the subscription delivery schedule will be, such as once only, or on a recurring basis, with or without an ending date. A name **716** is also chosen for the subscription to easily identify it later on. The configuration of a previously created subscription can be modified, for example, by choosing it from the "available subscriptions" drop-down list.

The automatic creation of an output file can be accomplished, for example, using computer programming executing on, for example, database server **120** in FIG. **1**. The programming can be done in a multitude of ways known to one of ordinary skill in the art, for example, using Microsoft Visual Basic or Microsoft.net.

FIG. **6** is a flow diagram **600** for a more detailed example of the automatic creation of an output file including at least one image and identifying information therefor. Flow diagram **600** assumes a case where there are predefined output file templates to choose from. When an image is selected for further use or for use with an output file, identifying information for the image is stored, for example, on database server **120** in system **100** of FIG. **1**. In the FIG. **1** scenario, the actual images are stored in image storage **124**, and database server **120** uses pointers to the stored images. Thus, in the present example, the identifying information comprises the pointer for a given image. After output options are made, they are also stored **604**, for example, on database server **120**.

Any information necessary for generating the output file in the template chosen, and which is not already available, is gathered **606**. The necessary information will depend on the type of output file, but might include, for example, a file name, whether any compression will be applied to the file, what image(s) go on a given slide (where the type of output file is a presentation application file), any custom images, color scheme(s), images size(s), email address(es), and an email subject, just to name a few. Gathering the necessary information could include the need to request information from the user.

After the necessary information has been gathered, the output file is generated **608** by putting the image(s) and identifying information into the template. An inquiry **610** is then made as to whether there is another template that needs to be populated. If there is another template to be populated, step **606** is returned to. If there is no other template to be populated, the output file(s) is delivered **612**.

The capabilities of one or more aspects of the present invention can be implemented in software, firmware, hardware or some combination thereof.

One or more aspects of the present invention can be included in an article of manufacture (e.g., one or more computer program products) having, for instance, computer usable media. The media has therein, for instance, computer readable program code means or logic (e.g., instructions, code, commands, etc.) to provide and facilitate the capabilities of the present invention. The article of manufacture can be included as a part of a computer system or sold separately.

Additionally, at least one program storage device readable by a machine embodying at least one program of instructions executable by the machine to perform the capabilities of the present invention can be provided.

US 7,849,083 B2

7

The flow diagrams depicted herein are just examples. There may be many variations to these diagrams or the steps (or operations) described therein without departing from the spirit of the invention. For instance, the steps may be performed in a differing order, or steps may be added, deleted or modified. All of these variations are consider a part of the claimed invention.

While several aspects of the present invention have been described and depicted herein, alternative aspects may be effected by those skilled in the art to accomplish the same objectives. Accordingly, it is intended by the appended claims to cover all such alternative aspects as fall within the true spirit and scope of the invention.

The invention claimed is:

**1**. A method of creating an output file from images, comprising:

processing a query by a processor against information in a database regarding a plurality of images and generating query results;

selecting at least one image from the generated query results;

selecting an output file type;

selecting a delivery method;

automatically creating at least one stand-alone output file with the file type corresponding to the selected output file type, wherein the at least one created stand-alone output file comprises the at least one selected image and preexisting identifying information for the at least one selected image; and

sending the at least one created stand-alone output file to a destination corresponding to the selected delivery method.

**2**. The method of claim **1**, wherein at least one output option is displayed for selecting.

**3**. The method of claim **2**, wherein the at least one output option comprises at least one output file type for the at least one created stand-alone output file.

**4**. The method of claim **3**, wherein the at least one output file type comprises an output file of a presentation application.

**5**. The method of claim **3**, wherein the at least one output file type comprises an output file of a spreadsheet application.

**6**. The method of claim **3**, wherein the at least one output file type comprises an output file of a word processing application.

**7**. The method of claim **3**, wherein the at least one output file type comprises an output file of an imaging application.

**8**. The method of claim **2**, wherein the at least one output option comprises a size for the at least one selected image.

**9**. The method of claim **2**, wherein the at least one output option comprises a layout for the at least one created stand-alone output file.

**10**. The method of claim **9**, wherein the layout comprises a template, and wherein at least one predefined option for the template is selected.

**11**. The method of claim **9**, wherein the layout comprises a predefined template.

**12**. The method of claim **11**, wherein the predefined template comprises an image of a single advertising page previously used in advertising.

**13**. The method of claim **11**, wherein the predefined template comprises at least one image of at least one page of a multi-page advertisement previously used in advertising.

**14**. The method of claim **13**, wherein the predefined template comprises at least one image of two pages of a preexisting multi-page advertisement.

8

**15**. The method of claim **11**, wherein the predefined template comprises a plurality of thumbnail images of pages in a preexisting multi-page advertisement.

**16**. The method of claim **11**, wherein the predefined template comprises at least one image of four pages from at least one preexisting advertisement.

**17**. The method of claim **11**, wherein the predefined template comprises a plurality of product images.

**18**. The method of claim **11**, wherein the predefined template comprises at least one product image and a preexisting advertisement page comprising the at least one product image.

**19**. The method of claim **11**, wherein the predefined template comprises at least one product image and data pertaining to sales resulting from the at least one product image.

**20**. The method of claim **11**, wherein the predefined template comprises at least one image of at least one advertising page previously used in advertising, wherein the at least one advertising page comprises a plurality of at least one of a product and a service, the predefined template further comprising data pertaining to sales resulting from the at least one advertising page.

**21**. The method of claim **1**, wherein the delivery method comprises at least one of an email with an attachment of the at least one created stand-alone output file, an email that includes a hyperlink for downloading the at least one created stand-alone output file, and directly downloading the at least one created stand-alone output file.

**22**. The method of claim **1**, wherein the automatically creating comprises:

automatically gathering information necessary to create the at least one stand-alone output file; and

automatically generating the at least one stand-alone output file using the gathered information.

**23**. The method of claim **1**, wherein the at least one stand-alone output file is created in response to a request that is received over a network.

**24**. The method of claim **23**, wherein the network comprises a global communications network.

**25**. The method of claim **1**, wherein the at least one image comprises at least one advertising image previously used in advertising.

**26**. The method of claim **25**, wherein the at least one advertising image comprises at least one of a product image and a page image, wherein a product image comprises a portion of a page image comprising at least one of a product and a service.

**27**. The method of claim **1**, further comprising displaying the generated query results.

**28**. The method of claim **1**, further comprising:

reprocessing the query against the database and generating updated query results at a subsequent time; and

automatically creating at least one other stand-alone output file based on the updated query results, wherein the at least one image and preexisting identifying information therefor are part of the at least one other created stand-alone output file.

**29**. The method of claim **28**, wherein the reprocessing comprises automatically reprocessing, and wherein the automatically reprocessing and automatically creating at least one other stand-alone output file are performed in accordance with a subscription.

**30**. The method of claim **29**, further comprising providing at least one other created stand-alone output file to a subscriber.

**31**. The method of claim **1**, wherein at least some of the plurality of images are stored outside the database, and

US 7,849,083 B2

9

10

wherein the information comprises pointers to the at least some of the plurality of images.

**32**. The method of claim **31**, wherein the at least some of the plurality of images is stored remotely from the database.

**33**. The method of claim **1**, wherein the preexisting identifying information comprises at least one description of content of the at least one image.

**34**. A computer system for creating an output file from images, the computer system comprising:

storage storing a database comprising information regarding a plurality of images and identifying information therefor;

a memory;

a processor in communications with the memory to execute a method of presenting database information, the method comprising:

processing a query against the information in the database and generating query results;

selecting at least one image from the generated query results;

selecting an output file type;

selecting a delivery method;

automatically creating at least one stand-alone output file with the file type corresponding to the selected output file type, wherein the at least one created stand-alone output file comprises the at least one selected image and preexisting identifying information for the at least one selected image; and

sending the at least one created stand-alone output file to a destination corresponding to the selected delivery method.

**35**. The computer system of claim **34**, wherein at least one output option is displayed for selecting.

**36**. The computer system of claim **35**, wherein the at least one output option comprises at least one output file type for the at least one created stand-alone output file, and wherein the at least one output file type comprises at least one of a presentation application output file, a spreadsheet application output file, a word processing application output file, and an imaging application output file.

**37**. The computer system of claim **35**, wherein the at least one output option comprises at least one of a size for the at least one selected image and a layout for the at least one created stand-alone output file.

**38**. The computer system of claim **34**, wherein the automatically creating comprises:

automatically gathering information necessary to create the at least one stand-alone output file; and

automatically generating the at least one stand-alone output file using the gathered information.

**39**. The computer system of claim **34**, further comprising:

reprocessing the query against the database and generating updated query results at a subsequent time; and

automatically creating at least one other stand-alone output file based on the updated query results, wherein the at least one other stand-alone output file includes the at least one image and preexisting identifying information therefor.

**40**. The computer system of claim **34**, wherein at least some of the plurality of images are stored outside the database, and wherein the information comprises pointers to the at least some of the plurality of images.

**41**. The computer system of claim **40**, further comprising additional storage separate from the storage for storing the at least some of the plurality of images.

**42**. The computer system of claim **34**, wherein the preexisting identifying information comprises at least one description of content of the at least one image.

**43**. A computer program product for creating an output file from images, the computer program product comprising:

a storage medium readable by a processor and storing programming for execution by the processor for performing a method of presenting database information, the method comprising:

processing a query against information in a database regarding a plurality of images and generating query results;

selecting at least one image from the generated query results;

selecting an output file type;

selecting a delivery method;

automatically creating at least one stand-alone output file with the file type corresponding to the selected output file type, wherein the at least one created stand-alone output file comprises the at least one selected image and preexisting identifying information for the at least one selected image; and

sending the at least one created stand-alone output file to a destination corresponding to the selected delivery method.

**44**. The computer program product of claim **43**, wherein at least one output option is displayed for selecting.

**45**. The computer program product of claim **44**, wherein the at least one output option comprises at least one output file type for the at least one created stand-alone output file, and wherein the at least one output file type comprises at least one of a presentation application output file, a spreadsheet application output file, a word processing application output file, and an imaging application output file.

**46**. The computer program product of claim **44**, wherein the at least one output option comprises choosing at least one of a size for the at least one selected image and a layout for the at least one created stand-alone output file.

**47**. The computer program product of claim **43**, wherein the automatically creating comprises:

automatically gathering information necessary to create the at least one stand-alone output file; and

automatically generating the at least one stand-alone output file using the gathered information.

**48**. The computer program product of claim **43**, further comprising:

reprocessing the query against the database and means for generating updated query results at a subsequent time; and

automatically creating at least one other stand-alone output file based on the updated query results, wherein the at least one other stand-alone output file includes the at least one image and preexisting identifying information therefor.

**49**. The computer program product of claim **43**, wherein at least some of the plurality of images are stored outside the database, and wherein the information comprises pointers to the at least some of the plurality of images.

**50**. The computer program product of claim **49**, wherein the at least some of the plurality of images is stored remotely from the database.

**51**. The computer program product of claim **43**, wherein the preexisting identifying information comprises at least one description of content of the at least one image.

* * * * *