**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARKET TRACK, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14 C 4957 |
| | ) | |
| EFFICIENT COLLABORATIVE | ) | Judge John J. Tharp, Jr. |
| RETAIL MARKETING, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**CORRECTED MEMORANDUM OPINION AND ORDER**</u>

For the reasons set forth below, the Defendant's Motion for Judgment on the Pleadings (Dkt. 44) is granted, and the Plaintiff's Motion for a Preliminary Injunction (Dkt. 76) is granted in part and denied in part.

**BACKGROUND**

Plaintiff Market Track, LLC ("Market Track") is a provider of business intelligence services, principally tracking and analyzing information relating to consumer advertising. Am. Compl., Dkt. 65, at ¶ 1. Market Track's "FeatureVision" product generates targeted reports for its customers—usually retailers and manufacturers of consumer goods—from Market Track's closely held data concerning promotional advertising in print, television, radio, and other media. *Id.* at ¶ 17. Market Track has been involved in this ad tracking business for 26 years. *Id.* at ¶ 19. Defendant Efficient Collaborative Retail Marketing, LLC ("ECRM") is Market Track's principal competitor in the ad tracking business. ECRM's "MarketGate" product directly competes with Market Track's FeatureVision. *Id.* at ¶¶ 29-30. After ECRM entered this market and began competing directly with Market Track, some of Market Track's customers switched to ECRM's product, while others were able to negotiate lower prices from Market Track's products and services. *See* Mincey Decl., Dkt. 78-3, at ¶ 33.

Market Track is the owner, by assignment, of U.S. Patent No. 7,849,083 (the "'083 Patent"), titled "Automatic Creation of Output Files from Images in Database." Am. Compl., Dkt. 65, at ¶ 23. Before Market Track acquired ownership of the '083 Patent in 2014, Market Track was the sole licensee of the patent in the ad tracking space. *Id.* at ¶ 24. Soon after Market Track acquired ownership of the '083 Patent, Market Track filed the first complaint in this case. *See generally* Compl., Dkt. 1. The three-count complaint alleged that ECRM's growing market share in the ad tracking market was unlawfully obtained through ECRM's infringement of the '083 Patent, misappropriation of Market Track's trade secrets under Illinois' Trade Secret Act, and deceptive trade practices under the Illinois Consumer Fraud and Deceptive Trade Practices Act. *Id.* at ¶¶ 39-62. After some discovery, Market Track amended its complaint, adding counts for common law tortious interference with contract and for false advertising and unfair competition under the Lanham Act. *See* Am. Compl., Dkt. 65, at ¶¶ 47-57, 74-79.

Pending before the Court are two fully briefed motions: (1) ECRM's Motion for Judgment on the Pleadings, Dkt. 44, asserting that the '083 Patent claims are directed to "abstract ideas" and therefore invalid under 35 U.S.C. § 101, and (2) Market Track's Motion for Preliminary Injunction, Dkt. 76, which seeks a preliminary injunction enjoining ECRM from engaging in conduct that infringes the '083 Patent, tortiously induces Market Track's customers to breach their confidentiality agreements, or makes false or misleading statements regarding Market Track. Each motion is governed by distinct factual and legal standards, which are set out in the analysis of each motion below along with the facts relevant to each motion.

## DISCUSSION

### I. Patentable Subject Matter Under 35 U.S.C. § 101

The Court first turns to ECRM's Motion for Judgment on the Pleadings, Dkt. 44, premised on the basis that each of the '083 Patent claims are directed to "abstract ideas" and are

therefore invalid under 35 U.S.C. § 101. Section 101 sets forth the subject matter that is eligible for patent protection: "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." Section 101, however, "contains an implicit exception for 'laws of nature, physical phenomena and abstract ideas.'" *Alice Corp. Pty, Ltd. v. CLS Bank Int'l,* 134 S. Ct. 2347, 2354 (2014). The Supreme Court has recognized this exception for over 150 years as necessary to prevent monopolization of the "basic tools of scientific and technological work" that "might tend to impede innovation more than it would tend to promote it," thereby thwarting the primary object of the patent laws." *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012)). ECRM maintains that the '083 Patent is invalid because its claims are directed to the abstract concepts of identifying, organizing, and presenting information.

### A. Ripeness of ECRM's Rule 12(c) Motion

A threshold question is whether the validity of the '083 Patent under § 101 should be determined before claim construction. Although it "will ordinarily be desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis," *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2012), claim construction is not necessary if the asserted claims, read most favorably to the patent holder, still recite an abstract idea. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014) (endorsing the district court's construction of all claim terms "in the manner most favorable to [the patent holder]" in deciding § 101 eligibility on a motion to dismiss); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 719 (Fed. Cir. 2014) (holding that formal claim construction is unnecessary when "there was no reasonable construction that would bring [the claims] within patentable subject matter") (internal quotation omitted). Patent claims are presumed to be valid under 35 U.S.C. § 282, and § 101 challenges to

validity must satisfy a "clear and convincing" standard. *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1304-05 (Fed. Cir. 2013), *aff'd*, 134 S. Ct. 2347 (2014). Therefore, the Court determines that ECRM's motion for judgment on the pleadings is ripe for adjudication on the merits, but that the Court must construe all terms in the patent claims in the manner most favorable to Market Track. *See Card Verification Solutions, LLC v. Citigroup Inc.*, No. 13 C 6339, 2014 WL 4922524, at *4 (N.D. Ill. Sept. 29, 2014) (denying a motion to dismiss after encountering a factual question as to whether a particular method, alleged to be an abstract idea, could be performed with pen and paper).

### B. The Supreme Court's Two-Step *Mayo* Test

Although "laws of nature, natural phenomena, and abstract ideas" are not patentable, inventions that "integrate" such laws, phenomena, or ideas "into something more" qualify for patent protection. *Alice*, 134 S. Ct. at 2354-55; *see also Diamond v. Diehr*, 450 U.S. 175, 187 (1981) (upholding a patent on a rubber-synthesizing process that employed "a well-known mathematical equation" because the patent claim only covered "the use of that equation in conjunction with all the other steps in their claimed process"). In *Mayo Collaborative Services v. Prometheus Laboratories., Inc.*, 132 S. Ct. 1289 (2012), the Supreme Court, recognizing that "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas," outlined a test for determining whether a claimed invention was sufficiently transformative to be a patentable application of such laws or abstract ideas. *Id.* at 1293-94. The *Mayo* test requires a two-step inquiry. *See Alice*, 134 S. Ct. at 2355. The first step is to determine whether the claims at issue are directed to a patent-ineligible concept, such as an abstract idea. *Mayo*, 132 S. Ct. at 1296-97; *see also Alice*, 134 S. Ct. at 2355. If so, the second step is to ask "whether the claims do significantly more than simply describe these natural relations." *Mayo*, 132 S. Ct. at 1297; *see also Alice*, 134 S. Ct. at 2355. *Mayo*'s second step

requires consideration of the elements of the claim, "both individually and 'as an ordered combination,'" in search of an "inventive concept" that is "significantly more than a patent upon the [ineligible concept] itself." *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1298, 1294). The guiding principle in applying the *Mayo* test is "'that patent law not inhibit further discovery by improperly tying up the future use of' these building blocks of human ingenuity." *Id.* at 2354 (quoting *Mayo*, 132 S. Ct. at 1301).

The Supreme Court characterized this basic *Mayo* framework as being derived from its precedents on patentable subject matter. *See Mayo*, 132 S. Ct. at 1294. Samuel Morse could not patent the use of electromagnetic force, "however developed," to send "characters, letters, or signs" at a distance, because that would be "improperly tying up the future use of laws of nature." *Mayo*, 132 S. Ct. at 1301 (quoting *O'Reilly v. Morse*, 56 U.S. (15 How.) 62, 112 (1853)). Still, Morse could patent his telegraph, including the device itself and its specific process for manipulating that unpatentable electromagnetic force, because it qualified as a patent-eligible *application* of the natural law. *See O'Reilly*, 56 U.S. (15 How.) at 112-13. Similarly, a mathematical formula constitutes an unpatentable abstract idea, but if an inventor develops a process for applying that formula in a novel way, the process as a whole may add enough to the unpatentable mathematical equation to make the process itself patentable. *See, e.g., Dier*, 450 U.S. at 187 (determining that "installing rubber in a press, closing the mold, constantly determining the temperature of the mold, constantly recalculating the appropriate cure time through the use of the formula and a digital computer, and automatically opening the press at the proper time" added enough to a commonly used mathematical formula to be patentable). By contrast, merely implementing the arithmetic steps in a newly discovered mathematical algorithm for converting numbers stored in binary-coded-decimal format to a pure binary format

did not add enough, under what is now known as *Mayo* step two, to transform that algorithm—an abstract idea—into patentable subject matter. *Gottschalk v. Benson*, 409 U.S. 63, 71 (1972); s*ee also Parker v. Flook*, 437 U.S. 584, 586, 590-92 (1978) (an invention that consists of nothing more than a novel mathematical formula for determining "alarm limits" in preexisting, commonly known processes in catalytic chemical conversion of hydrocarbons, does not add enough to the mathematical formula to be eligible for patent protection). These Supreme Court precedents inform both steps of the *Mayo* analysis, both in what constitutes patent-ineligible subject matter and in whether an invention adds a sufficiently "inventive concept" to qualify for patent protection. *Mayo*, 132 S. Ct. at 1299.

C.  **Application of *Mayo* to Computer-Implemented Methods**

In *Alice*, the Supreme Court reiterated the *Mayo* framework in invalidating "a method of exchanging financial obligations between two parties using a third-party intermediary to mitigate settlement risk." *Alice*, 134 S. Ct. at 2356. Applying *Mayo* step one, the Supreme Court held that the patented method was directed to the abstract concept of intermediated settlement, which was a "fundamental economic practice long prevalent in our system of commerce." *Id.* (quoting *Bilski v. Kappos*, 561 U.S. 593, 611 (2010)). In *Mayo* step two, the Court determined that the claimed invention was little more than implementation of "the abstract idea of intermediated settlement on a generic computer" and was therefore insufficient to add the "inventive concept" necessary to transform the patent-ineligible abstract idea into a patent-eligible invention. *Id.* at 2357-59.

In the year following the Court's decision in *Alice*, the Court of Appeals for the Federal Circuit has applied the *Mayo* two-step test to a number of patents claiming processes or methods implemented, as in the case of the '083 Patent, primarily on general purpose computers. In *Digitech Image Technologies, LLC v. Electronics for Imaging, Inc.*, 758 F.3d 1344 (Fed. Cir.

2014), the Federal Circuit evaluated the patentability of a "device profile" describing the transformation of image information between an image capture device (*e.g.*, a camera or scanner) and the digital image file it produces or between a stored digital image file and the image produced on a particular image output device (*e.g.*, a printer or display), as well as a method for generating the device profile. *Id.* at 1347, 1351. The Federal Circuit held that a "device profile" was nothing more than an ephemeral description of the relationship between two things, and such "information in its non-tangible form" was not patentable subject matter. *Id.* at 1349. Further, the method claims broadly recited a generic "process of taking two data sets" (*i.e.*, a data set for color distortions and a data set for spatial distortions) and "combining them into a single data set" (*i.e.*, an aggregated data set of color and spatial distortions). *Id.* at 1351. Because the claimed steps were not tied to any particular hardware, the Federal Circuit characterized this method as merely a "process that employs mathematical algorithms to manipulate existing information" and concluded that it was therefore an abstract idea. *Id.* (citing *Parker v. Flook*, 437 U.S. 584, 595 (1978)). On *Mayo* step two, the Federal Circuit found no additional limitations to this abstract idea after declining to read an implied limitation of tying the method to an image processor from the claim preamble. *Id.* Because the claimed method was only a bare abstract idea, the Federal Circuit held the process ineligible for patent protection. *Id.*

As did the Supreme Court in *Alice*, the Federal Circuit has applied the *Mayo* analysis to computer-implemented business processes. In *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350 (Fed. Cir. 2014), the Federal Circuit analyzed a patent covering a method of automatically creating third-party guarantees for online sales transactions. *Id.* at 1352. The Federal Circuit held that the creation of third-party transaction guarantees was an abstract idea that was "beyond question of ancient lineage." *Id.* at 1355; *see also Bilski*, 561 U.S. at 599, 611-12 (invalidating a

patent for a method to hedge risk by identifying market participants who bear counter-risks and automatically initiating hedging transactions between those participants). Automated creation of such contracts, using general purpose computers transmitting and receiving information over a network "with no further specification," was held to be "not even arguably inventive" and ineligible for patent protection, even when limited to online sales transactions. *buySAFE*, 765 F.3d at 1355.

The Federal Circuit has also applied the *Mayo* test in the context of assessing the patent eligibility of computer-implemented processes for delivering information to consumers. In *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014), decided after ECRM filed its motion, the Federal Circuit considered the patent eligibility of a method for distributing copyrighted media (*e.g.*, copyrighted text, music, or video) to consumers who gain access by first watching interactive or non-interactive sponsor messages. *See id.* at 712. Although the claimed method included "additional limitations, such as consulting an activity log," that "add[ed] a degree of particularity," on the first step of the *Mayo* analysis the Federal Circuit determined that the basic concept embodied by the claim was directed to "the abstract idea of showing an advertisement before delivering free content." *Id.* at 715. Turning to the second *Mayo* step, the Federal Circuit determined that the limitations grafted onto this abstract idea amounted to "routine, conventional activity" specified at a "high level of generality." *Id.* at 716 (quoting *Alice*, 134 S. Ct. at 2355). Moreover, "consulting and updating an activity log represent[ed] insignificant data-gathering steps" and added "nothing of practical significance" to the abstract idea. *Id.* Therefore, the Federal Circuit held that the method was ineligible for patent protection.

By contrast, in *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014), the Federal Circuit upheld the validity of a patent containing both method and system claims for

retaining website visitors who click on ads. *Id.* at 1257-58. The claimed method would use an "outsource provider" to mimic the "look and feel" of the host website, but serve content from a third-party merchant's website, thereby allowing the visitor to purchase products from third-party merchants without leaving the original site. *Id.* at 1248-49. Even though the claimed solution was arguably directed at an abstract idea and required no specialized hardware besides generic computer and networking hardware, the Federal Circuit held that the claims did not "merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet." *Id.* at 1257. Rather, the claimed solution "[overrode] the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink" with a particular procedure for generating a hybrid web page in order to allow a consumer to purchase products from a third-party website without ever visiting that site. *Id.* at 1257-58. The Federal Circuit held that this added enough of an "inventive concept for resolving this particular Internet-centric problem" to be patent-eligible. *Id.* at 1259.

In *Content Extraction,* the Federal Circuit's most recent published decision to examine patentable subject matter under § 101, the Court of Appeals analyzed a patent claim for extracting data from hard copy documents and storing that information in electronic memory, primarily used for electronic processing of bank checks. 776 F.3d at 1345. In the first *Mayo* step, the Federal Circuit held that the claims were drawn to the abstract idea of "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory." *Id.* at 1347. The Federal Circuit recognized that "humans have always performed these functions," including in the context of processing checks for banks. *Id.* On the second *Mayo* step, the Federal Circuit held that the addition of a scanner or other digitizing device and the use of

software to extract meaningful characters from the scanner data were "well-known at the time of filing," and therefore provided no "inventive concept" and could not be patented. *Id.* at 1348.

These recent cases demonstrate several principles relevant to an evaluation of the '083 Patent's subject matter eligibility. Although patentable subject matter under § 101 follows a separate test from novelty or obviousness, under § 102(a) and § 103, respectively, certain facts that are relevant to novelty or obviousness are also relevant to *Mayo* step two. *See, e.g.*, *Content Extraction*, 776 F.3d at 1348 (discounting "well-known" or long-practiced procedures in *Mayo* step two); *Ultramercial*, 772 F.3d at 716 (discounting "conventional" steps). It is important, then, to consider carefully whether claim elements using procedures that pre-date the filing of the patent provide the "inventive concept" necessary to save a patent from a § 101 challenge. *Content Extraction*, 776 F.3d at 1348 (finding no "inventive concept" in claims that "merely recite the use of . . . existing . . . technology"); *buySAFE*, 765 F.3d at 1355 (holding the implementation of generic computer functionality to be "not even arguably inventive"). Another factor is the nature of the problem to be solved; problems that arise uniquely in computing or in an internet context weigh in favor of finding an "inventive concept" in *Mayo* step two—but are not dispositive. *DDR Holdings*, 773 F.3d at 1258 (noting as a relevant but not dispositive factor that the problem being solved arises only "in the context of the internet"); *but see Ultramercial*, 772 F.3d at 714 (invalidating patent even when the claims were "directed to a specific method of advertising and content distribution that was previously unknown and never employed on the Internet before"). Finally, the Federal Circuit has rejected attempts to transform an abstract idea to patentable subject matter simply by limiting the method to a particular industry or to a particular technological context. *Content Extraction*, 776 F.3d at 1348 (rejecting claim limitations that merely "limit the abstract idea . . . to a particular technological environment");

*Digitech*, 758 F.3d at 1351 (rejecting attempts to tie the abstract method to a particular type of problem in *Mayo* step two).

### D.  Market Track's '083 Patent

With these principles in mind, the Court turns to the patent claims at issue in this case. ECRM argues that Claim 1 of the '083 Patent, a method claim, merely implements an "already routine process" more quickly on a computer. Def.'s Mem., Dkt. 45, at 2. ECRM argues further that Claim 1 is representative of the remaining claims of the '083 Patent. *Id.* at 1. According to ECRM, the other independent claims, Claim 34 and Claim 43, "perform the same abstract idea in claim 1," and are invalid for the same reason that Claim 1 is invalid. *Id.* at 13. Finally, ECRM argues that all of the dependent claims "derive from the same abstract idea as the independent claims and add only minor limitations" and therefore must fail with the independent claims. *Id.* at 13-14. Accordingly, the Court begins its analysis with Claim 1 of the '083 Patent.

Claim 1 of the '083 Patent recites:

A method of creating an output file from images, comprising:

[1] processing a query by a processor against information in a database regarding a plurality of images and generating query results;

[2] selecting at least one image from the generated query results;

[3] selecting an output file type;

[4] selecting a delivery method;

[5] automatically creating at least one stand-alone output file with the file type corresponding to the selected output file type, wherein the at least one created stand-alone output file comprises the at least one selected image and preexisting identifying information for the at least one selected image; and

[6] sending the at least one created stand-alone output file to a destination corresponding to the selected delivery method.

'083 Patent 7:15-32.

## 1. *Mayo* Step One

Under *Mayo*'s first step, the Court looks to whether the claimed method is directed to an abstract idea. The claim elements recite a method of processing a query and returning results, deriving content from those results, and then organizing and delivering that content somewhere. At its core, this claim recites the process of identification, organization, and presentation of stored information in a useful form, which is an "abstract idea, devoid of a concrete or tangible application." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014); *see also Content Extraction*, 776 F.3d at 1347 (holding that collecting, processing, and storing data were "undisputably well-known" abstract ideas); *Digitech*, 758 F.3d at 1351 (holding that "a process of gathering and combining data" from multiple sources was an abstract idea). The method does add certain limitations, such as requiring that the query be processed against a database, that the database regard images, that the output be a stand-alone file containing an image and associated information, and that the file be delivered. *See* '083 Patent 7:15-32. But adding a "degree of particularity" does not affect the first step of the *Mayo* inquiry; such elements must be considered only in the second *Mayo* step. *See Ultramercial*, 772 F.3d at 715. As will be seen, these limitations add no real degree of particularity, but regardless, at its core, the central concept of the claimed invention is highly abstract: it is the idea of identifying, organizing, and presenting stored information.

The identification, organization, and presentation of stored information is inarguably a building-block of the modern "information age" and "the knowledge economy." *See* Carl Shapiro & Hal R. Varian, *Information Rules: A Strategic Guide to the Network Economy* 9 (2013) ("Improved information infrastructure has vastly increased our ability to store, retrieve, sort, filter, and distribute information, thereby greatly enhancing the value of the underlying information itself."). Information that cannot be accessed and disseminated has no value, and

improvements to ease of access or dissemination enhance the value of existing information. *Id.* The basic concept of selecting a useful subset of data from a larger stored pool of data, organizing it for review, and disseminating the collected and organized results to others is the fundamental process by which information is used and shared in the modern economy. *See id.* at 91-92 (describing business models built around indexing content and either charging for access to paid content or for analytical or search tools for processing free content). Indeed, it is a process that is inherent in any attempt to analyze and disseminate data from time immemorial; "humans have always performed these functions." *See Content Extraction*, 776 F.3d at 1347. It is equally, if not more, fundamental than other concepts that the Supreme Court and the Federal Circuit have found to constitute building blocks of the modern economy, including, for example, intermediated settlement (*Alice*), risk-hedging (*Bilski*), third-party guarantees (*buySafe*), and collecting, identifying, and storing data (*Content Extraction*). Indeed, the abstract idea at the heart of the '083 Patent is essentially the mirror image of the abstract idea in *Content Extraction* of "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory." 776 F.3d at 1347. Here, the '083 Patent is directed toward the reversal of the same three steps: reading through stored data, recognizing certain information within that stored data, and presenting that information in a human-readable format. Market Track argues that these cases are "inapposite, as each involved claims that were limited to longstanding industry practices or fundamental truths," Pl.'s Resp., Dkt. 60 at 6 n.2, but that argument does not explain why the process of identifying, organizing, and presenting stored data fails to qualify as a "longstanding industry practice[]" or a "building block of the modern economy."[1] *Alice*, 134 S. Ct. 2356. Plainly, on the strength of these precedents, it does—which

---

[1] Market Track's argument that the existence of prior art employing the generic process

explains why Market Track identifies not a single case holding that a process of gathering, manipulating, presenting, or distributing stored data is not abstract.

## 2. *Mayo* Step Two

In the Court's view, there is not a substantial argument to be made that the '083 Patent is not premised on a fundamental practice, but there is another component to the required analysis; the '083 Patent is not invalid simply because it is based on an abstract concept. Under the second step of the *Mayo* analysis, it must be determined whether the patent adds "an inventive concept . . . that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Alice*, 134 S. Ct. 2347 (quoting *Mayo*, 132 S. Ct. at 1294). Market Track insists that "the Asserted Claims are a concrete and particularized set of inventions representing the type of ingenuity the patent system was designed to protect," Pl.'s Resp., Dkt. 60, at 1, but fails to convincingly describe just where the ingenuity reflected in the claims of the '083 Patent can be found.[2] The sole inventive concept Market Track attributes to

---

of selecting and disseminating stored data shows that its claimed invention is no threat to preempt the use of that generic process is curious, given the holdings in *Alice* and *Bilski* that the prevalence of the use of the generic concepts at issue in those case before the claimed invention demonstrates that the concepts constitute fundamental practices. *Alice*, 134 S. Ct. at 2356 (the practice of using third-party intermediaries to mitigate settlement risk is a fundamental economic practice long prevalent in our system of commerce"); *Bilski*, 561 U.S. at 609 (same). That a concept or generic process was widely employed before the patent issued hardly rebuts the argument that the concept or process is not abstract. Were that the case, the "fundamental . . . practice[s]" at issue in *Alice* and *Bilski* could not have been held to be abstract. *See Alice*, 134 S. Ct. at 2356; *Bilski*, 561 U.S. at 611. The question of whether the claimed invention improves upon prior art has more to do with the second step of the *Mayo* analysis—whether the claimed invention adds an inventive concept to the abstract or fundamental practice—than with the question of whether the patent employs a fundamental or abstract concept in the first place.

[2] Market Track's inability to identify an inventive concept to bring its claims within the scope of patentable subject matter set forth in § 101 is underscored by the fact that its lead argument in support of patent-eligibility is that in evaluating ECRM's motion for judgment on the pleadings, the Court must accept as true its conclusory assertion that the claims describe a "new and useful improvement" on prior art. Pl.'s Resp., Dkt. 60, at 9. That legal conclusion, of course, is entitled to no deference on this motion for judgment on the pleadings. *Adams v. City of*

the '083 Patent is its "concrete and particularized" method of "automatically creating . . . output files" that contain "*both* an image and associated information" and that can be "can be viewed offline and/or shared with others." *Id.* at 4, 7 (only innovation identified; emphasis in original). *Id.* at 10-11 n.7 ("the improvement of the Asserted Claims is **not** the generic use of a computer, but the concrete manner of using a computer system to automatically generate stand-alone output files with the requisite image and associated information") (emphasis in original).

This claimed improvement falls short in (at least) two respects. First, there is nothing inventive about the concept of reviewing offline files that combine data of different types or sources. Market Track concedes that the process of selecting and retrieving image data from a database, organizing the selected images and other associated data into an output file, and distributing that file for off-line review could be—and was—performed manually before the '083 Patent issued, albeit in a "time consuming and inefficient" manner. *Id.* And further, the marriage of image and text data in the presentation of information is a ubiquitous, not inventive, practice; a picture may be worth a thousand words, but most require at least a few words to explain their context, provenance, or relevance. *See, e.g., Wolf v. Capstone Photography, Inc.*, No. 2:13-cv-09573, 2014 WL 7639820, *12 (C.D. Cal. Oct. 28, 2014) (claimed system that matched photographs of race participants with identifying data held non-patentable under § 101); Random House Dictionary of the English Language 2d ed. (defining "caption": "a title or explanation for

---

*Indianapolis*, 742 F.3d 720, 727-28 (7th Cir. 2014). Rather, the Court must look to the substance of the claims themselves and the law, as set forth not only in § 101, but also by the Supreme Court and the Federal Circuit, as to what makes what is otherwise an embodiment of an abstract concept or fundamental process sufficiently inventive to warrant patent protection. The mere fact that a patent asserts that it represents an improvement on prior art does not, of course, suffice. And "improvement," standing alone, is not in any event the *sine qua non* of patentability that Market Track suggests; improvements must be the product of an inventive concept. *See Flook*, 437 U.S. at 595 n.18. Full automation may, of course, improve upon a prior, partially automated process, but it is clear that claiming automation by employing generic computer components does not satisfy the § 101 standard. *Alice*, 134 S. Ct. at 2359.

a picture or illustration"). What that leaves, then, is only Market Track's claim that its method of *automatically generating* those stand-alone output files combining image and text data is new and innovative.

What Market Track describes as its "concrete and particularized" methods for automatically creating those files, however, amount to nothing more than routine and well understood data processing procedures. Pl.'s Resp., Dkt. 60, at 7 & n.3 (describing the '083 Patent's high-level, general recitation of querying image databases and downloading the results for offline viewing or sharing). And therein lies the second deficiency in Market Track's claimed improvement: Adding generic data processing functions that are already "well-understood, routine, and conventional"—such as compiling, formatting, or labeling images—to automate these tasks does not transform an abstract idea into a patent-eligible method. *Alice*, 134 S. Ct. at 2359-60 (holding process for automatically generating contractual guarantees through application of routine computer functionality to be ineligible for patent protection).

As the '083 Patent acknowledges, processing queries for databases relating to images is a routine, conventional use of such databases. *See* '083 Patent at 1:19-64 (describing the "time consuming and inefficient process" of manually running queries against a database of images, and organizing the query results into output files that can be reviewed and shared offline), 3:33-60 (describing the generic, preexisting uses of existing database technologies for storing or returning information relating to advertising images). And converting the outputs of those query results into particular formats (*e.g.*, those compatible with "Microsoft PowerPoint or Adobe Acrobat") was also "typically accomplished by a user" before the filing of the '083 Patent. '083 Patent 1:48-56.

To this routine application of database and computer technology, the '083 Patent adds no innovation whatsoever. Notably, the '083 Patent does not disclose any technical description of *how* the steps in the process take place. Rather than disclosing any inventive process or technology for automatically generating stand-alone output files, the '083 Patent concedes that "[t]he automatic creation of an output file can be accomplished . . . in a multitude of ways known to one of ordinary skill in the art" using prepackaged software development programs. '083 Patent 6:15-18. Further, it specifically and repeatedly disavows any technical limitations on the claimed method. *See, e.g.*, '083 Patent at 3:20-22; 4:35-43 (images and output formats are selected "in some manner"); 5:41-43 (a query is run against a database "in some manner"); 7:4-7 (steps of the claimed method "may be performed in a differing order, or steps may be added, deleted, or modified").[3] It is difficult to understand how a process whose steps can be deleted, modified, supplemented, and re-ordered, and which depends on no particular system or software for its implementation, provides a "concrete" or "particularized" limitation on the abstract concept of identifying, organizing, and presenting data.

Claims outlining generic steps at "a high level of generality," without technical details, do not transform an abstract idea into a patent-eligible invention. *Alice*, 134 S. Ct. at 2357. The Federal Circuit's invalidation of the patent-in-suit in *Content Extraction* illustrates the point well. There, the Court of Appeals held that claim limitations that disclosed a method to "detect[] the presence of . . . symbols on a hard copy document and extract[] a field of information . . . based

---

[3] Claim 1 of the '083 Patent confirms that the listed elements add little innovation to the abstract data retrieval and dissemination concepts recited there. Claim 1 recites a step of "processing a query by a processor against information in a database regarding a plurality of images and generating query results" and "selecting at least one image" at a high level of generality, without specifying the type of query, the type of processor, or the type of database to be used. *See* '083 Patent, 7:15-21. Similarly, Claim 1 goes on to recite steps of "selecting an output file type . . . [and] delivery method" without limiting the possible output file formats or the delivery method. *Id.* at 7:22-23, 30-32.

on said detecting," without identifying particular processes for identifying symbols, merely describes generic optical character recognition technology" and therefore provides no "inventive concept." 776 F.3d at 1348-49. *See also, e.g., buySAFE*, 765 F.3d at 135 (holding that patent claims add no "inventive concept" when stating computer functionality in "generic" terms "with no further specification"); *Digitech*, 758 F.3d at 1349 (rejecting claims that "encompass all embodiments of the information [used in the invention], regardless of the process through which this information is obtained").

Market Track primarily seeks to distinguish the claims by limitations that purport to narrow the invention but in fact would not. *Id.* at 9 (stating that the '083 Patent's claims "improve on the prior art, beyond simply performing the processes more quickly" without identifying the actual claim language distinguishing the purported invention from the prior art). When executing the abstract idea of identifying and presenting stored information, that information must of course be presented in some form and the retrieval must employ some method to identify and deliver results. Narrowing the form of the output to a computer file, even a "stand-alone output file," using general purpose computing is not an inventive concept— especially when the output file types described in the specification (*e.g.*, "Microsoft PowerPoint," "Microsoft Excel," "Microsoft Word," or "Adobe PDF") were already common output formats for exporting information from advertising image databases. *See* '083 Patent 1:54, 4:18-21. Using a computer to display query results in a preselected format using prepackaged software is not the least bit inventive. Nor is the delivery of that file over a computer network or the internet an "inventive concept." *See Ultramercial*, 772 F.3d at 716; *buySAFE,* 765 F.3d at 1355 (receipt and transmission of data over computer network "is not even arguably inventive"); *CyberSource*, 654 F.3d at 1370. Accordingly, the elements in Claim 1 of the '083 Patent that

involve selecting images, file type, or delivery method are merely "insignificant 'data-gathering steps'" that "add nothing of practical significance to the underlying abstract idea." *Ultramercial*, 772 F.3d at 716 (quoting *CyberSource*, 654 F.3d at 1370).

Market Track's argument that the invention "improve[s] on the prior art beyond simply performing the processes more quickly," Pl.'s Resp., Dkt. 60, at 9 (citing '083 Patent 2:5-7:13), as required under *Mayo* step two, therefore rings hollow. So far as this Court can discern, the only "ingenuity" or "innovation" or "inventive concept" that Market Track identifies as being offered by the '083 Patent is the direction to automate a previously manual process (or, more accurately, to more fully automate a process that previously was only partially automated). That idea—automating an existing process through the application of routine, generic, computer systems and components—is simply not patent-eligible. Where "a patent's recitation of a computer amounts to a mere instruction to implement an abstract idea on a computer, that addition cannot impart patent eligibility." *Alice,* 134 S. Ct. at 2358 (internal quotation marks and edits omitted).[4]

And because the '083 Patent does not describe any particular method for "automatically creating" the stand-alone output file, the Patent does, in fact, implicate the preemption concerns that animate the *Mayo* test. The process, system, and software disclosed by the '083 Patent are so abstract and generic that they represent little more than an attempt to monopolize any and every technical implementation of the basic process of identifying, organizing, and presenting images and associated data stored in a database. Critically, claiming all forms of "automatically creating

---

[4] Market Track also argues that its invention does more than say "apply it with a computer," because the time-consuming manual process replaced by the invention also required a computer. *See* Pl.'s Resp., Dkt. 60, at 10-11 n.7. This argument ignores that the steps being automated are the time-consuming manual steps that, in the identified prior art, were performed by a user, not the portions of the prior-art process performed by the computer. In any event, an instruction to "apply a computer more often" differs from "apply a computer" not a whit.

at least one stand-alone output file" could preempt even future innovations not contemplated by the '083 Patent inventor. Dependent Claims 4, 5, 6, and 7, for example, do not provide meaningful limitations on the scope of the patent by referring to "an output file of a presentation application," "an output file of a spreadsheet application," "an output file of a word processing application," and "an output file of an imaging application." *Id.* at 7:38-47. It is difficult to imagine any form of output file that would not fit within one of these broad categories; taken at face value, then, the '083 Patent claims would preempt the use of any database software to output images in virtually any format. Such meaningless limitations do not bring the '083 claims within the ambit of patentable subject matter under § 101. *See Alice*, 134 S. Ct. at 2358 (allowing a patent on a computer configured to implement an abstract concept would "eviscerat[e] the rule that laws of nature, natural phenomena, and abstract ideas are not patentable"); *Benson*, 409 U.S. at 72 (a patent on a computer programmed to perform an algorithm would "wholly pre-empt the mathematical formula and in practical effect would be a patent on the algorithm itself"); *Morse*, 56 U.S. (15 How.) at 112-13 (holding a claim invalid when it claimed "the exclusive right to every improvement" involving the abstract idea, including methods to be discovered by "some future inventor"). Market Track's protests notwithstanding, the breadth and ubiquity of the process described in the '083 Patent presents a substantial threat to preempt any competing process drawn to the abstract concept of identifying, organizing, and presenting image data with associated text.

### 3. Machine-or-Transformation Test

The shortcomings of the '083 Patent are not limited to its failure to provide a concrete and particularized method for creating a stand-alone output file. It similarly fails to "require[] a specific machine," rendering Market Track's invocation of the "machine or transformation" test unavailing. *See* De la Iglesia Decl., Dkt. 60-1, at ¶ 20. The machine-or-transformation test looks

to whether a claimed process (1) "is tied to a particular machine or apparatus," or (2) "it transforms a particular article into a different state or thing." *Ultramercial*, 772 F.3d at 716. Although an analysis of § 101 patentable subject matter must follow the *Mayo* two-step framework, the machine-or-transformation test is still "a useful and important clue, an investigative tool, for determining whether some claimed inventions are processes under § 101." *Bilski*, 561 U.S. at 604.

Attempting to buttress the patentability of the '083 Patent's claims, Market Track argues that the '083 Patent is tied to a particular machine configured in a particular way. Market Track (and its expert, Erik de la Iglesia) point to the specified embodiments of the patent and argue that they require "a relational query," which in turn imposes additional requirements for a specific system architecture. *Id.* at ¶ 21. In essence, Market Track argues that in order for a computer system to employ the patented methods, it would require certain architectural features implied from the patent's description of "system 100," such as a "three-tiered architecture," "separately configured and scalable layers," and "specific configurations," *id.* at ¶¶ 23-24, and that the need for such architecture would be readily discernible to a person of ordinary skill in the art. But those architectural features are not claimed or described in the patent itself; nowhere, for example, does the '083 Patent use the term "relational query," yet Market Track maintains that the embodiments described require such a function. Indeed, contrary to Market Track's argument, the '083 Patent expressly disavows any requirement for specific programming or architecture. *See, e.g.*, '083 Patent 3:20-22 ("It will be understood that system 100 is merely one example of a system in accordance with the present invention. Many different configurations of such a system are possible."); 6:15-18 ("The automatic creation of an output file can be accomplished, for example, using computer programming executing on, for example, database

server 120 in FIG. 1. The programming can be done in a multitude of ways known to one of ordinary skill in the art, for example, using Microsoft Visual Basic or Microsoft.net. [sic]"); 6:53-55 ("The capabilities of one or more aspects of the present invention can be implemented in software, firmware, hardware or some combination thereof.").

The patent description also directly contradicts de la Iglesia's declaration that a particular architecture is required by making clear that "there need not be a web server at all," "image storage 124 need not be separate from database server 120; they could be part of the same physical machine," "web server 116 need not be physically separate from database server 120," and "a user could access database server 120 directly, rather than from user computer 102." *Id.* at 3:23-32. In other words, on the face of the patent itself, the invention could be implemented on a single general purpose computer running a "database program, for example, Microsoft SQL Server," configured "in a multitude of ways known to one of ordinary skill in the art." *Id.* at 3:33-34, 6:18-19. In other words, the patent language itself explicitly requires that the claims be read more broadly than the specification, and system 100 is therefore only a preferred embodiment of the invention. Thus, de la Iglesia's description of system 100 requirements would only apply to the preferred embodiment, and not necessarily to alternative embodiments covered by the meaning of the broader claims. *See Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009) ("[C]ourts must take care not to import limitations into the claims from the specification.")

Whether described embodiments would require a particular architecture is in any event irrelevant to whether the patent *claims* disclose the requirement of that particular architecture. They don't—and it is the claims, not the specifications, that govern analysis under § 101. *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir.

2013).[5] Market Track cannot amend the patent to impose architectural limitations that are not set forth in the patent itself. *See Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1302 (Fed. Cir. 2005) ("As this court has repeatedly cautioned, extrinsic evidence cannot be used to vary the plain language of the patent document."). Even where a patent's specifications set forth detailed implementations (which the '083 Patent specification does not), those embodiments cannot make a patent eligible under § 101 if the "claims themselves only contain generalized software components arranged to implement an abstract concept on a computer." *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012). And in any event, there is no basis to invoke the specifications in support of patent eligibility in this case, because (as noted above) those specifications expressly disavow that they impose any limitations on the scope of the patent's claims. Market Track's effort to imbue the claims with requirements for a specific system architecture and components is, therefore, quite unpersuasive. If, as *Alice* teaches, a method that says: "implement an abstract idea on a computer" is not patentable, arguing that the implementation will require a particular configuration of generic computer components—*none of which are specified in the patent claims themselves*—does nothing to make the claims more concrete and particularized. *See Alice*, 134 S. Ct. 2358 (limiting the use of an abstract idea "to a particular technological environment" held to be insufficient to

---

[5] Market Track argues in its preliminary injunction brief that "ECRM is incorrect that such embodiments are irrelevant, as the embodiments presumptively are encompassed by the '083 Patent claims." Pl.'s Mem., Dkt. 78, at 20-21. Market Track misunderstands ECRM's argument: ECRM argues that the embodiments contain *limitations* not present in the claims, and Market Track's argument that the claims *include* the embodiments does nothing to refute ECRM's argument that the claims preempt every conceivable embodiment of an unpatentable abstract idea. The Court agrees with *both* parties, then, that the patent's claims are not limited to only the patent's preferred embodiments. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 843 (Fed. Cir. 2010) ("Generally, a claim is not limited to the embodiments described in the specification unless the patentee has demonstrated a clear intention to limit the claim's scope."), *aff'd*, 131 S. Ct. 2238 (2011). The point is that the claims are substantially broader than the embodiment-as-interpreted-by-de la Iglesia.

make the implementation patent eligible). Rather, the lack of defined architecture underscores the point that the patent addresses only the abstract, generic, non-patentable idea, rather than any inventive means for performing the task.

Even if the '083 Patent set forth the specific architecture that de la Iglesia contemplates, that requirement would not render the claims patent-eligible because the system he describes is not the slightest bit "inventive." To the contrary, the premise of de la Iglesia's affidavit is that those of ordinary skill in the art would readily discern that the process and system required by the patent would include the characteristics he identifies, such as a "three-tiered architecture" and three components consisting of a web server, database server, and image storage. De la Iglesia Decl., Dkt. 60-1, at ¶¶ 23-24. De la Iglesia would, "in practice," add other architectural features to make the system "scalable" with "consistent operation," or "if deployed in a cloud environment," but by his own words these features are for scalability, reliability, security, maintainability, and performance and are not strictly necessary to implement the claimed methods. *See id.* at ¶¶ 25-26. Specifying a particular system architecture may narrow the scope of the claims somewhat, but it does nothing to imbue the claims with inventiveness. *See Content Extraction*, 776 F.3d at 1347-48 ("For the role of a computer in a computer-implemented invention to be deemed meaningful in the context of [*Mayo* step two], it must involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'").

The claimed invention also fails to satisfy the "transformation" prong of the machine-or-transformation test. The transformation prong looks to whether the claimed invention effects a physical transformation of "physical objects or substances," or at the very least things that are "representative of physical objects or substances." *See Ultramercial*, 772 F.3d at 717 (quoting *In*

*re Bilski*, 545 F.3d 943, 954 (Fed. Cir. 2008) (en banc), *aff'd on other grounds*, 561 U.S. 593).

Market Track contends that by combining image and sales data into a single output file, the invention "create[s] new information, not readily discernible from the information sources." Pl.'s Resp., Dkt. 60, at 12. But as the Federal Circuit held in *Digitech,* a method that describes a process for combining data from different sources into a single data set—"taking existing information . . . and organizing this information into a new form"—is not patent eligible. 758 F.3d at 1351.

For this reason, manipulation of digital data, such as performing a relational query on a computer database or cropping, resizing, or arranging digital images and associated information into different formats, does not satisfy the transformation prong of the machine-or-transformation test. In *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366 (Fed. Cir. 2011), for example, the Federal Circuit affirmed the invalidation of a patent that claimed a process for organizing credit card data in a manner that facilitated the identification of fraudulent transactions, holding that "[t]he mere collection and organization of data . . . is insufficient to meet the transformation prong" of the machine-or-transformation test. 654 F.3d at 1370; *see also, e.g., Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 Fed. App'x 988, 993 (Fed. Cir. 2014) (holding data manipulation to be "no meaningful transformation because it merely makes the originally-gathered information accessible to different destinations without changing the content or its classification"); *Digitech*, 758 F.3d at 1351 (applying *Mayo* step two without expressly discussing the transformation prong of the machine-or-transformation test, but noting that "a process that employs mathematical algorithms to manipulate existing information to generate additional information is not patent eligible").

Market Track argues that the execution of a relational query in a relational database is sufficient to "effect a transformation," but it cites no legal authority for this proposition. Pl.'s Resp., Dkt. 60, at 12. Indeed, at least one court has observed that "relational databases are 'well-understood, routine, conventional [and] previously known to the industry,'" and perform exactly the type of "generic computer function" that *Alice* warns about. *Shortridge v. Found. Constr. Payroll Serv., LLC*, No. 14-cv-04850-JCS, 2015 WL 1739256, at *12 (N.D. Cal. Apr. 14, 2015) (citing Tracy Pickerell, *The Paradox Database Management Program: Worth the Time & Effort to Explore*, 9 No. 9 Law. PC 6 (1992)). In other words, the technology that Market Track argues provides the "transformation" was described as "well-understood" and "routine" in 1992, over two decades before the '083 Patent application was filed. *See id.* Therefore, the claimed method for identifying, organizing and presenting preexisting computer data does not satisfy the transformation prong of the machine-or-transformation test.

### 4. The '083 Patent is Distinguishable from Other Patentable Ideas

The Federal Circuit's recent decision in *DDR Holdings* provides a good illustration of the inventiveness required to make an invention founded on an abstract, generic concept eligible for patent protection.[6] In *DDR Holdings*, the Federal Circuit acknowledged that the challenged patent claim was directed to an abstract idea that could be described as "making two web pages look the same," "syndicated commerce on the computer using the Internet," "making two e-commerce web pages look alike by using licensed trademarks, logos, color schemes and layouts," or "that an online merchant's sales can be increased if two web pages have the same

---

[6] Market Track argues in its preliminary injunction briefs that the Federal Circuit held that the claims at issue in *DDR Holdings* were not directed at an abstract idea. *See* Pl.'s Reply, Dkt. 140, at 24. Although the Federal Circuit did struggle to precisely identify the nature of the abstract idea to which the patent claims were directed, *DDR Holdings* was decided on *Mayo* step two. *See DDR Holdings*, 773 F.3d at 1257 ("[U]nder any of these characterizations of the abstract idea, the . . . patent's claims satisfy *Mayo/Alice* step two.").

look and feel." *DDR Holdings*, 773 F.3d at 1257 (internal quotation marks omitted). On *Mayo* step two, however, the Federal Circuit found it dispositive that the patented method's treatment of website links diverged from "the routine, conventional functioning of Internet hyperlink protocol" by retaining website visitors—a "problem specifically arising in the realm of computer networks"—through a particular process of modifying the conventional hyperlink behavior to bring information from the target site back to the site of origin, rather than sending the viewer to a new site (all the while retaining the appearance of the original site). In essence, the invention modified conventional hyperlink technology to generate a hybrid web site. As the Court of Appeals observed, this process had no "brick and mortar" analogue and represented a substantial departure from standard hyperlink protocols. *Id.* at 1257-58. It was, in short, an inventive solution to a peculiar problem encountered on the Internet.

The '083 Patent offers no similar innovation. Rather, and as discussed at length above, the '083 Patent recites only steps commonly used in the "brick and mortar" world and discloses only ordinary computer functionality to transform that previously partially automated process to a fully automated process. The steps recited in the '083 Patent *are* the "routine, conventional functioning" of computer databases and systems, as described in the '083 Patent's Background section. *Cf. DDR Holdings*, 773 F.3d at 1257. Unlike the unconventional behavior of the hyperlinks implemented in the *DDR Holdings* patent, Market Track has not identified the necessary "inventive concept" in its invention's use of advertising image databases.

Market Track's reliance on *Trading Technologies International, Inc. v. CQG, Inc.*, No. 05 C 4811, 2015 WL 774655 (N.D. Ill. Feb. 24, 2015) is misplaced for the same reason. The patent claims at issue in *Trading Technologies* solved a problem particular to electronic trading of securities, by which latency between the change in prices and a trader's action could result in

a trader executing trades at an unintended price. 2015 WL 774655, at *4 (citing *DDR Holdings*, 773 F.3d at 1257). Judge Coleman noted that this was a new problem exclusive to electronic trading, because the analogous open outcry trading pits used an entirely different trading protocol, involving simultaneous verbal communication and hand signals, for matching bids to offers. *Id.* at *5. Further, Judge Coleman found that the patent claims added an "inventive concept" by pioneering a price display that juxtaposed and integrated conventional price displays in a manner that facilitated the solution to the latency problem. By contrast, the '083 Patent solves only the problem of the formatting and delivery of query results, which has clear analogues in pre-computing filing and retrieval tasks, and only by implementing a well-known process on a general purpose computer. '083 Patent 1:40-64.[7]

Market Track's reliance on *Smartflash LLC v. Apple, Inc.*, Nos. 6:13cv447-JRG-KNM, 6:13cv448-JRG-KNM, 2015 WL 661174 (E.D. Tex. Feb. 13, 2015) is also unwarranted. The broad and generic claims asserted in the '083 Patent differ substantially from the claims at issue in *Smartflash,* where the district court found that the patented claims did not preempt all uses of

---

[7] If anything, *Card Verification Solutions, LLC v. Citigroup Inc.*, No. 13 C 6339, 2014 WL 4922524 (N.D. Ill. Sept. 29, 2014), on which Market Track also relies, provides more support to ECRM's arguments. In *Card Verification*, the Court considered the patent eligibility of a device-agnostic method for passing confidential information (*e.g.*, credit card information) securely through a trusted third party intermediary, by performing mathematical functions on the information to be transmitted. 2014 WL 4922524, at *2. Judge Kendall determined that even when read most favorably to the patent holder, the claim was "directed toward a patent-ineligible abstract idea," and also held that the claims failed to disclose a machine because they did not prescribe a required architecture and "universally fail[ed] to specify how the computers are 'specially programmed to perform the steps claimed in the patent.'" *Id.* at *5. Unlike this case, however, the Court encountered a disputed factual matter in the *Mayo* step two analysis while analyzing whether the claim steps requiring a "pseudorandom number and character generator" could be performed as a "mental process" with pen and paper. *Id.* at *4. Recognizing that the inquiry would require "discovery on the issue," Judge Kendall denied the motion to dismiss and deferred the § 101 analysis until after discovery and claim construction. *Id.* at *4-5. That problem is not present here, where Market Track has acknowledged that the claimed process could be, and was routinely, performed without the claimed computer system.

the abstract idea, because the claims made specific recitations "when taken as ordered combinations." *Id.* at \*9.[8] In contrast, the '083 Patent explicitly disclaims any limitations based on the order that the steps are performed:

> The flow diagrams depicted herein are just examples. There may be many variations to these diagrams or the steps (or operations) described therein without departing from the spirit of the invention. ***For instance, the steps may be performed in a differing order, or steps may be added, deleted or modified. All of these variations are consider [sic] a part of the claimed invention.***
>
> While several aspects of the present invention have been described and depicted herein, alternative aspects may be effected by those skilled in the art to accomplish the same objectives. Accordingly, ***it is intended by the appended claims to cover all such alternative aspects as fall within the true spirit and scope of the invention***.

*Id.* at 7:1-13. Read in conjunction with the patent specification, these claim limitations—quite unlike those in *Smartflash*—provide no practical limitation at all.

### 5. Other Claims in the '083 Patent

The other independent claims, Claim 34 and Claim 43 of the '083 Patent are invalid for essentially the same reasons that Claim 1 is invalid. *Accenture Global Services,* 728 F.3d at 1341 ("system claims that closely track method claims . . . will generally rise and fall together"). Claim 34 recites:

> A computer system for creating an output file from images, the computer system comprising:
>
> storage storing a database comprising information regarding a plurality of images and identifying information therefor;

---

[8] Also in *Smartflash*, the patent holder was able to point to concrete examples of non-infringing implementations of the abstract idea as proof that the patent did not preempt the use of the abstract idea. *See Smartflash*, 2015 WL 661174 at \*7 ("[B]oth Smartflash and Defendants identified numerous non-infringing alternatives, such as those employed by Netflix and Spotify."). Market Track has not identified any way that someone could employ the abstract idea (of retrieving stored images and their associated information, presented in useful formats) without infringing on its broad patent claims, except by somehow not doing it "automatically."

a memory;

a processor in communications with the memory to execute a method of presenting database information, the method comprising:

[Claim 1, restated]

'083 Patent 9:8-31.

Claim 43 recites:

A computer program product for creating an output file from images, the computer program product comprising:

a storage medium readable by a processor and storing programming for execution by the processor for performing a method of presenting database information, the method comprising:

[Claim 1, restated]

*Id.* at 10:4-25. As discussed above, Claim 1 recites an abstract idea, so adding a generic computer with "storage," "memory," and "a processor," as Claim 34 does, *id.* at 9:8-16, or executing the method with a processor and stored programming, as Claim 43 does, *id.* at 10:4-9, effectively add nothing more than the words "apply it with a computer," which means Claim 34 and Claim 43 must fail with Claim 1. *See Alice*, 134 S. Ct. at 2358. Market Track contends that these claims describe "system and computer program products," *id.* at 2:31-33; Pl.'s Resp., Dkt. 60, at 4, but given the complete absence of any architecture or programming criteria set forth in the claims, it is a substantial stretch to say that these claims describe any products at all. Rather, they amount to a generic instruction to apply existing and well known technology resources to the claimed method described in order to automate it. That is not the invention of any new, or improved, product.

Finally, the rest of the dependent claims in the '083 Patent are invalid "because all the claims are substantially similar and linked to the same abstract idea." *Content Extraction*, 776 F.3d at 1348 (internal quotation marks omitted). None of the dependent claims adds any

meaningful narrowing limitations to narrow the basic abstract idea at the heart of Claim 1. Claims 2-20, Claims 25-27, Claims 35-37, and Claims 44-46 merely add a token bit of specificity about the output file format, all of which are routine or conventional options. '083 Patent 7:33-8:22, 8:40-49, 9:32-44; 10:26-38. Claim 21 adds conventional delivery methods like email attachments, email hyperlinks, or direct downloads. *Id.* at 8:23-28. Claim 22, Claim 38, and Claim 47 add the automation of a single step of the three respective independent claims by gathering information and using it. *Id.* at 8:29-34, 9:45-50, 10:39-44. Claims 23-24 add the ability to query the database over a network, including over the Internet. *Id.* at 8:35-39. Claims 28-30, Claim 39, and Claim 48 add a step of automating periodic subscriptions to the delivery or retrieval of the generated results. *Id.* at 8:50-65, 9:51-59, 10:45-54. Claims 31-33, Claims 40-42, and Claims 49-51 add details about how the database organizes image data. *Id.* at 8:66-9:7, 9:59-10:3, 10:55-65. Each of these claim limitations are well-understood, routine, and conventional uses and configurations of databases, as is acknowledged in the '083 Patent's Background section. *Id.* at 1:20-64 (describing—as preexisting, conventional practices—organizational schema for image databases, types of information stored in databases, conventional query practices, conventional file formats for database outputs, and file retrieval or export techniques). After eliminating each of the patent claims that recite a conventional or routine practice already described in the Background section, all that remains is the subscription claims: Claims 28-30, 39, and 48. Applying repetition of a step that is not itself patent eligible adds very little to the patentable side of the ledger, because it is merely "postsolution activity, implemented with entirely conventional methods." *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 10 C 4053, 2015 WL 1523818, at *7-8 (N.D. Ill. Mar. 13, 2015); *see also Mayo*, 132 S. Ct. at 1298. Therefore, the

Court concludes that no possible construction of the '083 Patent claims can bring them within the realm of patentable subject matter and that the '083 Patent is invalid in its entirety.

Having reviewed the patent closely, having read the parties' extensive briefs (both on the 12(c) motion itself and on the motion for a preliminary injunction), and having conducted a six hour hearing on Market Track's preliminary injunction motion, the Court is still at a loss to understand what "inventive concept" imbues the '083 Patent. So far as the Court can see, and so far as Market Track has been able to explain, the only innovation the '083 Patent offers is the idea to automate, by means of generic computer systems and concepts, a process for identifying, organizing, and distributing images and associated information that previously and routinely had been executed, in part, manually. As the Background information set forth in the '083 Patent acknowledges, the claimed method is "typical[]" (albeit inefficient when performed manually by a user), '083 Patent 1:48, 61-62, and it is clear that any so-called "inventive concept" provided by the '083 Patent consists of no more than "[s]tating an abstract idea while adding the words 'apply it with a computer.'" That is insufficient to impart patent eligibility. *Alice*, 134 S. Ct. at 2358. Therefore, the Court finds that the '083 Patent is invalid under any plausible construction of its claims.

## II.  Market Track's Motion for Preliminary Injunction

Also pending before the Court is Market Track's Motion for a Preliminary Injunction. Market Track seeks a preliminary injunction on three of its claims: its claim for patent infringement (Count I), its claim for false advertising and unfair competition under the Lanham Act (Count II), and its claim for tortious interference with contractual relations (Count V). Market Track does not seek an order that ECRM cease and desist from engaging in the activity allegedly giving rise to Market Track's claims for misappropriation of trade secrets (Count III) or

for deceptive trade practices under the Illinois Consumer Fraud and Deceptive Trade Practices Act (Count IV).

A plaintiff seeking a preliminary injunction must show "(1) that [it] is likely to succeed on the merits, (2) that [it] is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 769 (7th Cir. 2011).[9] The plaintiff must demonstrate the threshold factors of "a reasonable likelihood of success, inadequate remedy at law, and irreparable harm absent the injunction" before the Court turns to the balance of harms and the public interest. *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't. of Health*, 699 F.3d 962, 972 (7th Cir. 2012). The Court therefore applies this framework to the three claims at issue on this motion.

### A.     Patent Infringement

The Court denies Market Track's motion for a preliminary injunction with respect to patent infringement, because, as discussed above, the '083 Patent is invalid for being directed to a patent-ineligible abstract idea. Because the Court has granted judgment for ECRM on the pleadings on the patent infringement claim, Market Track has no likelihood of success on that claim. *See Trebro Mfg. v. Firefly Equip.*, 748 F.3d 1159, 1169 (Fed. Cir. 2014) ("[T]he accused infringer can defeat the likelihood of success on the merits by raising a substantial question as to the validity of the patent in suit"). Therefore, Market Track  has not made its threshold showing

---

[9] The Federal Circuit applies regional circuit law when exercising pendent jurisdiction over claims not within its subject matter jurisdiction and in applying procedural standards, such as the equitable factors considered in a motion for a preliminary injunction. *See Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1367 (Fed. Cir. 2008). Accordingly, Seventh Circuit law governs the preliminary injunction factors for the purposes of this motion.

of a reasonable likelihood of success, and the Court need not consider the other preliminary injunction factors. *See LifeScan Scotland, Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361, 1366 (Fed. Cir. 2013) (holding that raising a substantial question concerning validity ends the preliminary injunction inquiry). Accordingly, the Court determines that Market Track is not entitled to a preliminary injunction against ECRM's alleged patent infringement.

### B.    Tortious Interference with Contract

The Court turns to Market Track's argument that it is entitled to an order enjoining ECRM from inducing Market Track's customers from breaching their contracts with Market Track. The gist of this claim is Market Track's contention that ECRM has induced Market Track's customers to violate the duty of confidentiality set forth in their contracts by disclosing to ECRM the "format, content details, and layout" of the reports Market Track generated for those customers.[10] Pointing to Count III of Market Track's complaint, which asserts violations of the Illinois Trade Secrets Act ("ITSA"), ECRM argues that the tortious interference claim is preempted by the ITSA, but then proceeds to argue that the non-disclosure provisions at issue were not enforceable because the information disclosed was not confidential at all, much less trade secret material. For its part, Market Track further obfuscates the nature of the information at issue by acknowledging (as it must) that it has asserted a claim for misappropriation of trade secrets under the ITSA in its complaint but asserting that only *some* of the information that ECRM allegedly misappropriated constitutes trade secret material subject to the ITSA, and that

_____

[10] Market Track does not define "content details," but the Court agrees with ECRM that "it appears to mean the type of information that appears in a report (such as the particular columns of given information provided for a given advertisement)," Resp., Dkt. 111, at 14 n.15, as opposed to the specific information provided in any particular report, which would be time-sensitive and of little value to ECRM. *Id.* at n.16.

the misappropriation of the remainder is actionable under a tortious interference theory. Which information is subject to which theory, however, is left unexplained.

### 1. Preemption by the Illinois Trade Secret Act

A threshold question, raised in ECRM's response, is whether the Illinois Trade Secret Act ("ITSA") preempts Market Track's tortious interference claim. *See* Def.'s Resp., Dkt. 111, at 14-15. If the ITSA preempts the tortious interference claim, then Market Track cannot demonstrate any likelihood of success on the merits of that claim. *PepsiCo, Inc. v. Redmond,* 54 F.3d 1262, 1271 (7th Cir. 1995) (a preempted tortious interference claim "has no merit; [Plaintiff] cannot prevail on a claim that does not exist."). And since Market Track has not moved for a preliminary injunction based on its claim under the ITSA, injunctive relief barring ECRM's activities in this regard would not be warranted at this juncture.[11]

The ITSA displaces "conflicting tort, restitutionary, unfair competition, and other laws of [Illinois] providing civil remedies for misappropriation of a trade secret," but does not affect

---

[11] A complaint is not required to plead legal theories, *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 701 (7th Cir. 2014), so whether the conduct at issue—namely, ECRM's alleged efforts to induce Market Track customers to breach non-disclosure provisions of their contracts with Market Track—gives rise to liability under the ITSA, the tort of tortious interference with contract, or both, is in one sense irrelevant. Market Track is not required to choose between, or delineate, these theories in order to move forward with its claim for relief based on the alleged conduct, so whether its tortious interference claim is preempted by the ITSA would not ordinarily be a question that needs an answer in order for the case to move forward through discovery. But to obtain preliminary injunctive relief, Market Track is required to demonstrate (among other things) that it has a substantial likelihood of success on the merits; that obligation requires it to identify the legal theory, or theories, that would give rise to liability based on the conduct alleged. *See Kinney ex rel. N.L.R.B. v. Int'l Union of Operating Eng'rs, Local 150, AFL-CIO*, 994 F.2d 1271, 1278 (7th Cir. 1993) (grant of preliminary injunctive relief requires examination of legal theories as well as facts). Here, Market Track has expressly disavowed the assertion of its ITSA claim (Count III) as a basis for preliminary injunctive relief, so the Court has no occasion to assess the viability of that theory of liability at this juncture. Market Track's claim for preliminary injunctive relief based on the alleged misappropriation of its confidential information therefore stands or falls on the likelihood that it can prevail on a claim of tortious interference with contract. Whether that legal theory is preempted by the ITSA is, therefore, relevant to this motion.

"contractual remedies, whether or not based on misappropriation of a trade secret," or "other civil remedies that are not based upon misappropriation of a trade secret." 765 ILCS 1065/8. Here, there is no issue as to the preemption of contractual remedies; there is no contract between Market Track and ECRM. Rather, the preemption dispute here pertains to whether the ITSA preempts a claim for tortious interference with the plaintiff's contract with someone other than the alleged tortfeasor (*i.e.*, Market Track's customers). That question turns on two subsidiary issues: (1) whether the information implicated by the claim—the "reports, content detail, and layouts" of Market Track's reports—is within the ambit of the ITSA's preemption section; and (2) whether MT's claim of tortious interference is "based on misappropriation" of that information.

As to the first issue, ECRM has the better of the argument. As the party seeking a preliminary injunction, it is Market Track's burden to establish a likelihood of success on the merits. *See Wisc. Right to Life, Inc. v. Barland*, 751 F.3d 804, 830 (7th Cir. 2014) ("On the merits questions, 'the burdens at the preliminary injunction stage track the burdens at trial.'") (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006)); *Cox v. City of Chicago*, 868 F.2d 217, 219 (7th Cir. 1989) (holding that moving plaintiffs "must carry the burden of persuasion with respect to the four prerequisites of a preliminary injunction"). Thus, in the face of ECRM's assertion of a preemption defense, Market Track must demonstrate that it is likely the defense will fail. To this end, it claims that its tortious interference claim involves "confidential" information, but not "trade secret information," and therefore is not within the ambit of the ITSA's preemption section. Pl.'s Reply, Dkt. 140, at 21.

This attempt to stave off preemption fails for several reasons. Most significantly, Market Track's assertion that its tortious interference claim does not encompass trade secret information

is belied by its complaint, which expressly alleges that the reports at issue in the tortious interference claim constitute trade secrets: "Market Track's pricing information, customer lists, and reports, among other information, are proprietary and confidential. . . . Market Track's proprietary and confidential information qualify as trade secrets protected by the Illinois Trade Secrets Act, 765 ILCS 1065." Am. Compl., Dkt. 65, at ¶¶ 59-60. These allegations appear first in the trade secret count, and are subsequently realleged in the tortious interference count. *Id.* at ¶ 74. In addition, Market Track's opening brief expressly claims that the conduct on which its tortious interference claim is based "also constitutes misappropriation of Market Track's trade secrets." Pl.'s Mem., Dkt. 78, at 26 n.12. These statements concede that the information at issue in the tortious interference claim is within the ambit of the ITSA.

Further, to the extent that Market Track seeks to avoid preemption by asserting that the information disclosed to ECRM is not protected by the ITSA, then it is Market Track's burden to identify that information and to distinguish it from the "trade secret" information on which its ITSA claim is based. This requirement appears to put Market Track in a quandary: asserting that its reports are, or include, trade secrets would give rise to preemption (per above), while acknowledging any lesser degree of protection might compromise its claim under the ITSA. Market Track has therefore sought to obfuscate the nature of the information implicated by its ITSA (Count III) and tortious interference (Count V) claims, and to avoid the implication of paragraphs 59, 60, and 74 of its complaint, by coyly (and inaccurately) claiming that "[a]lthough *certain* of this information "may be" trade secret, Market Track has never alleged—nor will it allege—that *all* of it is." Reply, Dkt. 140, at 22. Putting aside the fact that this statement cannot be squared with Market Track's complaint or its opening brief, this cat-and-mouse game does not provide the Court with adequate information to conclude whether the information is, or is

not, subject to ITSA preemption. The consequence of that failure lands at Market Track's doorstep: because it has failed to distinguish adequately between the trade secret and non-trade secret information implicated by its tortious interference claim, it has failed to establish that it has a substantial likelihood of success in avoiding ITSA preemption.[12]

Market Track's quandary, moreover, is largely illusory and its waffling unnecessary. Even if some of the information at issue does not rise to the level of a trade secret, the ITSA preempts claims of misappropriation of confidential information even if that information does not rise to the level of a trade secret, as the Seventh Circuit held in *Spitz v. Proven Winners North America, LLC*, 759 F.3d 724, 733 (7th Cir. 2014). *See also, e.g.*, *Cronimet Holdings, Inc. v. Keywell Metals, LLC*, No. 14 C 3503, ---F. Supp. 3d---, 2014 WL 5801414, *8-9 (N.D. Ill. Nov. 7, 2014); *Montel Aetnastak, Inc. v. Miessen*, 998 F. Supp. 2d 694, 719-20 (N.D. Ill. 2014); *Tax Track Sys. Corp. v. New Inv. World, Inc.*, No. 01 C 6217, 2005 WL 936638, at *9-10 (N.D. Ill. Mar. 24, 2005), *aff'd*, 478 F.3d 783 (7th Cir. 2007). Market Track does not distinguish *Spitz*, and offers no response to ECRM's invocation of the case other than to denigrate the quality of the Seventh Circuit's analysis. Reply, Dkt. 140, at 23 n.19. Its response does not provide a basis for a district in this Circuit to regard *Spitz* as anything other than binding precedent. *See Luna v. United States*, 454 F.3d 631, 636 (7th Cir. 2006) ("[T]he district court should not be making

---

[12] Market Track's failure to identify the information subject to its tortious interference claim would also preclude the Court from enjoining any future interference with Market Track's contracts with the appropriate detail and specificity required of preliminary injunction orders. *See* Fed. R. Civ. P. 65(d)(1). A tortious interference claim could only provide the basis for an injunction over actions that would constitute non-preempted tortious interference with Market Track's contracts. Market Track's proposed preliminary injunction order, however, which would order ECRM "to cease and desist from . . . inducing customers to breach their contracts with Market Track," would be too broad and would potentially restrain actions that cannot be enjoined under this legal theory. Because Market Track has opted not to litigate what is or is not a trade secret at this stage, the Court would be unable to put ECRM on fair notice as to what behavior would or would not be enjoined.

contrary predictions [of how a state's highest court would rule on a matter of state law] when this [Court of Appeals] has ruled squarely on the matter. Ours is a hierarchical system."). Thus, trade secret or no, the Court is bound to treat the allegedly confidential information disclosed as within the scope of the ITSA's preemption section.[13]

Contrary to Market Track's assertion, in *Hecny Transportation, Inc. v. Chu,* 430 F.3d 402 (7th Cir. 2005), the Seventh Circuit did not hold that (or even address the question of whether) the ITSA extends to the misappropriation of information that does not rise to the level of a trade secret. Rather, *Hecny* focused on the nature of the duty the tortfeasor was alleged to have violated, and endorsed the view that where a duty exists without regard to whether a breach involved information that was worthy of protection under the Trade Secrets Act (whatever the scope of that act's protection), the ITSA does not preempt the claim. *Id.* at 405 ("The [ITSA preemption provision] does not apply to duties imposed by law that are not dependent upon the existence of competitively significant secret information, like an agent's duty of loyalty to his or her principal.") (quoting the Commissioners' Comment to the Uniform Trade Secrets Act, on which the ITSA is based). That brings us to the second question implicated by the parties' dispute about preemption, namely whether a claim of tortious interference with confidentiality provisions in a contract constitutes "misappropriation" of information protected by the ITSA.

*Hecny* suggests that if tortious interference is a claim that does not depend on whether the information is secret, then the ITSA does not preempt it. Market Track contends that its tortious

---

[13] That ITSA preemption extends to confidential information that does not rise to the level of a trade secret does not, of course, leave Market Track without a remedy. It simply means that Market Track's ITSA claim must be construed to include such information. It does not follow, however, that "Market Track should necessarily succeed on its trade secret claim." Pl.'s Reply, Dkt. 140, at 23 n.20. Whether Market Track is likely to prevail on its ITSA claim is not addressed here, because it is not before the Court. As explained above, in its opening brief, Market Track expressly disclaimed seeking a preliminary injunction on the basis of the ITSA.

interference claim is independent of any secret quality of the disclosed information; ECRM has no business inducing Market Track's customers to breach their contracts with Market Track by disclosing Market Track's reports, it argues, whether those reports are confidential or not. And so the Seventh Circuit has held, albeit in construing not the ITSA but the substantively similar Wisconsin Trade Secrets Act (both the Illinois and Wisconsin statutes are modeled on the Uniform Trade Secrets Act). Noting that with respect to non-contractual remedies, the WTSA "carves out" remedies not based on misappropriation of a trade secret, the Seventh Circuit held in *IDX Systems Corp. v. Epic Systems Corp.*, 285 F.3d 581, 586 (7th Cir. 2002) that "[t]he tort of inducing breach of a non-disclosure contract . . . is 'not based upon misappropriation of a trade secret.' It is based on interference with the contract."

But as ECRM notes, the ITSA "defines misappropriation of trade secrets to include the taking of confidential information by 'inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use . . . .'" Def.'s Resp., Dkt. 111, at 14 (quoting 765 ILCS 1065/2(a)). And so it does. Section 1065/2(b) of the ITSA defines "misappropriation" to include the acquisition or disclosure of trade secret information by "improper means," a term the ITSA defines to include "breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use." *Id.* at 1065/2(a). In other words, under Illinois law, a claim of inducement to breach a non-disclosure agreement is not merely "based upon" the alleged misappropriation of secret information—it *is* a claim for misappropriation of that information. The core of Market Track's tortious interference claims are that ECRM induced breaches of customers' "confidentiality obligations" to Market Track. *See, e.g.*, Pl.'s Mem., Dkt. 78, at 5-6; Letter, Ex. 3, Dkt. 78-1, at 1. The Seventh Circuit has held repeatedly that with the enactment of the ITSA, "Illinois . . . abolished all common law theories of misuse of [secret]

information." *Composite Marine Propellers, Inc. v. Van Der Woude,* 962 F.2d 1263, 1265 (7th Cir. 1992); *see also, e.g., PepsiCo,* 54 F.3d at 1271. Whatever the merit of the Seventh Circuit's interpretation of the WTSA in *IDX,*[14] that interpretation does not bear scrutiny with respect to the ITSA in view of the statute's inclusion of tortious interference with a non-disclosure agreement within the definition of "misappropriation." *IDX* was based on Wisconsin law and does not govern the interpretation of Illinois law. Based on the ITSA, and the nature of the contractual non-disclosure provisions at issue here, Market Track's argument that its tortious interference claim is not preempted because it is not based upon misappropriation cannot succeed.[15]

### 2. Harm Resulting from Breach

Even if Market Track were able to demonstrate that its tortious interference claim were not preempted by the ITSA, Market Track has otherwise failed to demonstrate a likelihood of success on that claim. Under Illinois law, a claim for tortious interference with contractual relations requires "(1) a valid and enforceable contract; (2) defendants' awareness of the contractual obligation; (3) defendants' intentional and unjustified inducement of the breach; (4) subsequent breach caused by defendants' unlawful conduct; and (5) resultant damages." *Burrell v. City of Mattoon*, 378 F.3d 642, 652 (7th Cir. 2004) (citing *Clarage v. Kuzma*, 342 Ill. App. 3d 573, 583, 795 N.E.2d 348, 357 (Ill. App. Ct. 2003)).

---

[14] The WTSA appears to similarly define inducement of a breach of a non-disclosure agreement as misappropriation of a trade secret—*see* W.S.A. § 134.90(1)(a) and (2)—but the opinion in *IDX* does not address the fact that the statute defines "misappropriation" to include inducement of a breach of a non-disclosure agreement. Nor does it acknowledge the prior opinions of the Court holding that the ITSA "abolished all common law theories of misuse of [secret] information." *Composite Marine*, 962 F.2d at 1265.

[15] In *IDX*, the Seventh Circuit also observed that a claim for inducing the breach of a non-disclosure agreement does not "conflict" with a claim of trade secret misappropriation and so is not subject to preemption for that reason as well. 285 F.3d at 586. Market Track did not advanced this argument and it is therefore forfeited and need not be addressed. The Court is aware of no Illinois authority, however, holding that a claim for breach of a non-disclosure agreement is not preempted by the ITSA because such a claim does not conflict with the ITSA.

It is unnecessary to examine whether Market Track has satisfied all of these elements because it plainly fails to establish causation between the breach of contract and the "resultant damages" required to support the claim. *Burrell*, 378 F.3d at 652; *see also Fitzpatrick v. Catholic Bishop of Chi.,* 916 F.2d 1254, 1257 (7th Cir. 1990). A causal link between the alleged breach and the alleged injury is necessary to both the "resultant damages" element in the merits of Market Track's tortious interference claim, *see Sharon Leasing, Inc. v. Phil Terese Transp., Ltd.*, 299 Ill. App. 3d 348, 358, 701 N.E.2d 1150, 1158 (Ill. App. Ct. 1998) (defining damages as the amount "that would place plaintiff in the position it would have been in had the contract been performed"), and to the irreparable harm analysis relevant to the preliminary injunction standard. *Cf. Apple, Inc. v. Samsung Elec. Co.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012) (requiring a "causal nexus" between patent infringement and irreparable harm in order to enjoin the infringement).

Market Track identifies several injuries it claims to have sustained by reason of ECRM's alleged tortious interference, including loss of market share, price erosion, and loss of customer goodwill, but does not trace the causation of that harm to any contractual interference. The sole evidence introduced to show that Market Track was harmed by ECRM's alleged contractual interference is the speculative statement of its CEO that copying Market Track reports allows ECRM to avoid "significant expense" and "makes it easier for customers to leave Market Track for ECRM." Mincey Decl., Dkt. 78-3, at ¶¶ 41-43. The affidavit of Julie Davis, a C.P.A. retained by Market Track, adds nothing in this regard; that affidavit merely parrots Ms. Davis's "understanding," based on Market Track's claims, that it has lost customers and market share as a result of Market Track's contractual interference. Davis Decl., Dkt. 78-4, at ¶ 17.

These conclusory allegations fail to provide any evidence about what portion, if any, of the alleged loss of business is attributable to the alleged tortious interference with contract rather

than to the alleged infringement of the '083 Patent. That won't do as a general matter; to support a damage claim based on distinguishable conduct, there must be an evidentiary basis to support a finding that that conduct caused some portion of the damages claimed. *Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 413 (7th Cir. 2000); *U.S. Gypsum Co. v. LaFarge N. Am., Inc.*, 508 F. Supp. 2d 601, 639-40 (N.D. Ill. 2007); *Sharon Leasing*, 299 Ill. App. 3d at 358, 701 N.E.2d at 1157. It is particularly problematic here, because (as discussed below) the lion's share of the damages claimed resulted from the actions alleged to have infringed the patent. Those damages cannot be factored into the analysis. The Court has held the '083 Patent to be invalid, so ECRM could not have infringed it; whatever consequences befell Market Track as a result of those actions do not constitute legal injuries to Market Track. Thus, to the extent that Market Track has alleged that it lost customers and market share, and experienced price erosion, as a result of ECRM's alleged infringement of the '083 Patent, ECRM is not liable for those injuries. Market Track has provided no basis to distinguish customers lost and other damages attributable to the alleged, but erroneous, claims of patent infringement from losses attributable to tortious interference, and Market Track has provided no evidence to show that any portion of the damages it claims was specifically attributable to tortious interference.

What little evidence Market Track offers—that is to say, Mr. Mincey's declaration—strongly suggests that ECRM's alleged infringement of the '083 Patent is substantially responsible for the damages it has experienced. Mincey avers that "[i]f ECRM did not offer the patented features of the '083 Patent, it would not be able to compete with Market Track for these customers." Mincey Decl., Dkt. 78-3, at ¶ 32. If it is true, as Mincey claims, that ECRM could not have competed with Market Track for customers absent infringement of the patent, then the bulk of its alleged loss of customers is more properly attributed to the alleged infringement than

to tortious interference with Market Track's customer contracts. Mincey's affidavit effectively asserts that ECRM's patent infringement is a but-for cause of Market Track's loss of customers: "***Because of*** ECRM's sale of products and services using the patented features of the '083 Patent, ECRM has taken market share from Market Track and otherwise required Market Track to lower its prices significantly." *Id.* at ¶ 33. It is reasonable to conclude, then, that it was the substantial cause of those damages.

Market Track's inability to distinguish damages caused by tortious interference from injuries caused by the erroneously alleged patent infringement is only part of the problem afflicting its tortious interference damage argument. On the record before the Court, Market Track's alleged price erosion, loss of market share, and loss of customer goodwill could very well be caused by a host of other factors. For example, ECRM highlights a 2014 Market Track study that found that, ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████ Market Track Competitive Assessment Study, ECRM Ex. 11, Dkt. 111-3, at 5-8, 10-11. Further, internal Market Track emails recite a litany of similar comments and concerns from customers opting not to renew their contracts with Market Track. *See, e.g.*, Resp., Dkt. 111-7, Ex. 12 ███████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████; Ex. 13 ████████████████████ ████████████████████████████████████████████████; Ex. 14 ███████ ██████████████████████████████████████████████████; Ex. 19 ████████

████████████████████████████████████████████████████████████

█████████████████████████████████ ; Ex 22 ████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████ .

Thus, even assuming that all of Market Track's factual allegations are true (which the Court is *not* required to do on this motion for preliminary injunction), Market Track has failed to show that its alleged damages were not caused by lawful competition (or, for that matter, other unlawful practices alleged under the other counts in its amended complaint) rather than unlawful interference with contract.

### C. False Advertising Under the Lanham Act and Illinois Uniform Deceptive Trade Practices Act

Market Track also seeks to enjoin ECRM from making false statements about Market Track, which Market Track argues violates the Lanham Act and the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"). To succeed on a false advertising claim under the Lanham Act or the IUDTPA,[16] Market Track must prove (1) a false statement of fact by ECRM in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the ECRM caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products. *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th

---

[16] Both Market Track and ECRM agree that the same standards govern the false advertising claims under the Lanham Act and the IUDTPA. *See* Pl.'s Mem., Dkt. 78, at 31; Def.'s Resp., Dkt. 111, at 21; *see also Morningware, Inc. v. Hearthware Home Prods., Inc.*, 673 F. Supp. 2d 630, 639 (N.D. Ill. 2009).

Cir. 1999). If the challenged statement is shown to be "literally false," Market Track need not show that any customer was actually deceived. *Id.* at 820.

Market Track argues that seven particular ECRM statements constitute false advertising under the Lanham Act and the IUDTPA. It complains most forcefully about a particular graphic ECRM has used in a slide show presentation featuring a side-by-side juxtaposition of "Leading Competitor Coverage" of "Top 50 Advertising DMA's" next to "ECRM Data Coverage" of "Over 65,000 Stores" and "100% Census Coverage":



## COVERAGE DOWN TO THE STORE LEVEL

Leading Competitor Coverage

ECRM Data Coverage

Top 50
Advertising DMA's

Over 65,000 Stores
100% Census Coverage

Over One Billion Ads | Over 1,000 Categories | Over 500 Retail Chains
Over 275K Different Brands | Over 14K Unique Manufacturers | 7 Distinct Media Types | 5 Year History

Confidential and Proprietary to ECRM                                                          8

This presentation was presumably made to ECRM customers and potential customers, though Market Track offers no evidence as to how widely the presentation was disseminated. ECRM does not, however, dispute that the presentation qualifies as advertising.

The other allegedly deceptive statements came in the context of sales emails where ECRM's sales employees represented to potential customers that Market Track double-counts ads in its own data, and that ECRM has converted a high number of Market Track's existing customers to the ECRM service. Pl.'s Mem., Dkt. 78, at 10. Market Track argues that these statements are false, because Market Track's product employs sophisticated techniques to avoid double counting ads in its data, and because its own records show that fewer than 80 clients have switched from Market Track to ECRM. *See* Mincey Decl., Dkt. 78-3, at ¶ 48.

### 1. "Commercial Advertising or Promotion"

The Lanham Act's false advertising provision applies only to "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). To constitute "commercial advertising or promotion," a communication must, among other requirements, be sufficiently disseminated to the relevant purchasing public to constitute advertising or promotion within the relevant industry. *Gordon & Breach Sci. Publishers v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1536 (S.D.N.Y. 1994).[17] There is no requirement that the alleged communication be published or broadcast to the public, especially in industries where promotion often takes a different form. *Neuros Co. v. KTurbo, Inc.*, 698 F.3d 514, 522 (7th Cir. 2012). The Seventh Circuit has defined "promotion" in these industries to include "a systematic communicative endeavor to persuade possible customers to buy the seller's product." *Id.* Therefore, private one-to-one communications do not constitute

---

[17] Most federal courts have adopted the *Gordon & Breach* four-part test for determining whether a communication qualifies as "commercial advertising or promotion." *See, e.g.*, *Neuros Co. v. KTurbo, Inc.*, 698 F.3d 512, 521-22 (7th Cir. 2012) (collecting cases from seven other circuits adopting the *Gordon & Breach* test). Under the *Gordon & Breach* framework, "commercial advertising or promotion" under the Lanham Act must be (1) commercial speech (2) made by a defendant who is in commercial competition with the plaintiff (3) for the purpose of influencing consumers to buy defendant's goods or services, and (4) that is sufficiently disseminated to the relevant purchasing public to constitute advertising or promotion within that industry. 859 F. Supp. at 1536. Only the fourth prong is disputed on this motion, so the Court treats that requirement as dispositive.

"commercial advertising or promotion" unless systematically communicated to a substantial portion of the relevant market for a product. *Compare ISI Int'l, Inc. v. Borden Ladner Gervais, LLP*, 316 F.3d 731, 733 (7th Cir. 2003) (cease and desist letters sent by patent owner to the customers of the patent licensee not covered by Lanham Act), *and Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 624 (7th Cir. 2005) (three instances of person-to-person communications not sufficient to constitute "promotional material" subject to the Lanham Act), *with Neuros*, 698 F.3d at 522 (promotional materials subject to Lanham Act when used in a "road show" of individual face-to-face presentations to "most" potential customers in a market with a small number of buyers and when posted on the company's website), *and Underground Solutions, Inc. v. Palermo*, No. 13 C 8407, 2014 WL 4703925, at *9-10 (N.D. Ill. Sept. 22, 2014) ("presentations to a large group of industry members" amounted to "advertising or promotion" subject to the Lanham Act). Market Track has not indicated in its motion how many potential customers are in the market in which Market Track and ECRM compete, although it does mention that it has approximately 850 customers at this time. *See* Mincey Decl., Dkt. 78-3, at 2. On these facts, the two emails that accuse Market Track of "double counting" and the four emails that overstate the number of clients who have switched from Market Track to ECRM are more like isolated one-to-one communications, as occurred in *ISI International* or *Sanderson*, than like a series of systematically communicated presentations to a substantial portion of the target market, as occurred in *Neuros* or *Underground Solutions*. Therefore, Market Track has not shown on this motion that the emails were "commercial advertising or promotion" under the Lanham Act.

## 2. Literal Falsity

The only remaining statement to be evaluated for false advertising, then, is ECRM's presentation showing a side-by-side comparison of Market Track's "Top 50" coverage and

ECRM's data coverage, which Market Track contends is literally false because its coverage area is substantially larger than the graphic depicts. ECRM counters that the slide does not literally identify Market Track as the "leading competitor" or literally say that Market Track only tracks 50 designated market areas ("DMAs"). The Court rejects ECRM's first argument, because the other slides within the same presentation identify Market Track—and no one else—by name as the leading competitor (and, arguably, as ECRM's sole competitor), *see* ECRM Ad Comparisons, MT Reply Ex. 15, at 23, and ECRM conceded at the preliminary injunction hearing that any viewer would understand the slide to refer to Market Track and not any other competitor. Tr. of Apr. 9, 2015 Hearing, at 225:6-16. In the context that it was presented to potential customers, there is no ambiguity as to whose coverage was represented in the graphic. *See Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 512-13 (7th Cir. 2009) (holding that "the meaning of the alleged literal falsehood must be considered in context and with reference to the audience to which the statement is addressed").

The Court also rejects ECRM's second argument that the slide is not literally false because it does not explicitly say that Market Track tracks ads in *only* 50 DMAs. Despite its name, the doctrine of "literal falsity" does not require literal falsity. *See Schering-Plough*, 586 F.3d at 512-13 ("When this is stated as the doctrine of 'literal falsity,' 'literal' must be understood in the common colloquial sense in which Americans (not realizing, or perhaps not caring, that they are making Fowler turn in his grave) say things like 'I am literally out of my mind.'"). What it requires is a showing that the challenged statement is unambiguous and could not reasonably be understood to mean anything different. *Id.* at 512 ("[A] representation may be so obviously misleading that there is no need to gather evidence that anyone was confused."); *see also BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1091 (7th Cir. 1994) (affirming

district court finding that a statement advertising that antifreeze "meets the Ford and GM specifications" was literally false when the antifreeze had not been tested for compliance with those specifications); *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 13 (7th Cir. 1992) (holding that "rice-based oral electrolyte solution" was literally false, despite the fact that the product was derived from rice, because the relevant industry understood "rice-based" to be a term of art for products containing powdered whole rice).

The graphic in question presents a misleading juxtaposition, and similarly misleading comparisons have been found to be literally false for the purposes of the Lanham Act. *See Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 202 (3d Cir. 2014) (affirming a finding of literal falsity in the statement "#1 Most Powerful Steam . . . when compared to leading competition in the same price range" when the statement was juxtaposed next to competitor's iron from a different price range); *Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 35 (1st Cir. 2000) (holding that the television advertising tag line "whiter is not possible" in close temporal proximity with a description of chlorine bleach could be construed by a reasonable factfinder to be a literally false statement that the advertised product is objectively superior to chlorine bleach at whitening clothes); *Ott v. Target Corp.*, 153 F. Supp. 2d 1055, 1069-70 (D. Minn. 2001) (holding that a placard with a doll manufacturer's trademark could reasonably be interpreted as a literally false statement of objective fact that the dolls behind the placard were manufactured by that trademark owner). ECRM's side-by-side coverage maps unambiguously communicate that the two maps are intended to be an apples-to-apples comparison of objective fact. The slide title is "Coverage Down to the Store Level" with 50 dots plotted on the "Leading Competitor Coverage" and what appears to be over 65,000 dots plotted on the "ECRM Data Coverage," and the positioning of the images invites the viewer to

conclude that ECRM's coverage is complete (down to individual stores) and that Market Track compiles a far less complete data set than ECRM.[18] Because the conclusion is unavoidable, the Court finds that the slide in context is a literally false statement about Market Track's data coverage.

Market Track has also proven the rest of its required prima facie elements of false advertising. As discussed above, Market Track must show that (1) a false statement (2) actually deceived a substantial segment of its audience (3) in a material way, (4) that the statement traveled through interstate commerce and (5) has been or is likely to be injured as a result. *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999). By proving that the coverage slide was literally false, Market Track satisfies the first prong and need not show the second prong. *Id.* ECRM does not challenge (nor could it reasonably challenge) that the competing services' data coverage is a material factor influencing customer decisions or that these statements, hosted on its website and shown to firms nationwide, traveled through interstate commerce.

Finally, disparaging false statements about a competitor's product, especially when the relevant market is nearly entirely occupied by two competitors, harms the competitor's goodwill and competitive position. *See Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 16 (7th Cir.

---

[18] ECRM argues that the slide represents "that competitor products generally collect only one sample retailer ad per DMA rather than many ads from all stores over the entire area of a DMA," Def.'s Resp., Dkt. 111, at 24, but this explanation suffers from three deficiencies. First, the competitor's map is arbitrarily capped at the "Top 50" DMAs, rather than the "more than 200" DMAs tracked by Market Track. *See* Mincey Decl., Dkt. 78-3, at ¶ 8. Further, the competitor data inexplicably consolidates all retailers (up to 1500, *see id.*) of any given DMA into a single dot on the "competitor" side but not the ECRM side. Finally, each "sample retailer ad" is represented by the identically sized dot on the maps, inviting the conclusion that the each dot represents an identical geographical footprint. Rather than conveying a message that ECRM has more granular coverage "down to the store level," the presentation misrepresents that ECRM's data covers 1300 times the geographical area and that its competitor does not even offer granularity down to the *retailer* level.

1992) (finding "no doubt" that false comparisons between two products "necessarily diminishes [the competing product's] value in the minds of the consumer"). Damage to reputation and loss of goodwill are cognizable injuries under the Lanham Act, "even absent a showing of business loss," because "it is virtually impossible to ascertain the precise economic consequences" of such harms. *See id.*[19] Therefore, Market Track has satisfied the last Lanham Act false advertising element that the falsehood resulted "in actual or probable injury" to Market Track. *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 971, 975 (7th Cir. 1999). Market Track has proven that it is likely to succeed on each element of its Lanham Act claim, and has therefore demonstrated a likelihood of success on the merits of that claim.

### 3.  Irreparable Harm and Inadequate Remedy at Law

On Market Track's false advertising claims, the Court must determine whether Lanham Act violations are entitled to a presumption of irreparable harm. Until 2006, it was "well settled that injuries arising from Lanham Act violations are presumed to be irreparable, even if the plaintiff fails to demonstrate a business loss." *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002) (citing *Abbot Labs.*, 971 F.2d at 16). ECRM argues, however, that the Supreme Court's opinion in *eBay v. MercExchange, L.L.C.*, 547 U.S. 388, 393-94 (2006), eliminated this presumption when it required that district courts exercise equitable discretion "consistent with traditional principles of equity" rather than relying on presumptions to categorically deny or grant injunctive relief in particular types of cases. *eBay* involved a

---

[19] Because a plaintiff need not show business loss to prevail on a Lanham Act claim, the causation problems afflicting Market Track's tortious interference claim do not apply to the false advertising claim. As discussed above, the injury that Market Track alleged to support its tortious interference claim were loss of market share and price erosion, but could not specifically attribute those losses to any unlawful practices by ECRM. Market Track would be hard pressed to identify lost customers or price erosion specifically attributable to false advertising, either, but Market Track has identified separate injuries—to reputation and goodwill—which naturally flow from false advertising and support the Lanham Act claim.

permanent injunction in the patent context, but its reasoning applies equally to copyright claims and to preliminary injunctions, as well. *See id.* at 392; *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012) (holding that *eBay* eliminates the presumption of irreparable harm for preliminary injunctions in copyright cases).

Cases in this district have continued to apply a presumption of irreparable injury from Lanham Act violations on at least nine occasions since the Supreme Court published its *eBay* decision.[20] Only one of these cases cited *eBay*, but it did not discuss *eBay*'s implications for the presumption of irreparable harm in Lanham Act cases. *See Neuros Co. v. KTurbo, Inc.*, No. 08-CV-5939, 2013 WL 1706368, at *4-5 (N.D. Ill. Apr. 17, 2013). The litigants in each of these cases appear not to have made the argument that *eBay* changed the law. But because ECRM has specifically made the argument, the Court, out of an abundance of caution, declines to apply a blanket presumption, but rather looks to the specific facts of this case to determine whether Market Track is likely to suffer irreparable harm from an ongoing Lanham Act violation.[21]

Here, the alleged unlawful conduct is a literally false statement disparaging the leading competitor in a market primarily shared by two competitors. The false statement goes to the

---

[20] *See Venus Labs., Inc. v. Vlahakis*, No. 15 C 1617, 2015 WL 1058264 (N.D. Ill. Mar. 5, 2015) (Blakey, J.) (trademark); *Dental USA, Inc. v. McClellan*, No. 13 CV 260, 2013 WL 4451257 (N.D. Ill. Aug. 16, 2013) (Zagel, J.) (trademark); *Neuros Co. v. KTurbo, Inc.*, No. 08-CV-5939, 2013 WL 1706368 (N.D. Ill. Apr. 17, 2013) (Darrah, J.) (false advertising); *Deckers Outdoor Corp. v. Does 1-100*, No. 12 C 10006, 2013 WL 169998 (N.D. Ill. Jan. 16, 2013) (Lee, J.) (trademark); *Tory Burch LLC v. Does 1-100*, No. 12 C 7163, 2012 WL 4581409 (N.D. Ill. Oct. 2, 2012) (Lee, J.) (trademark); *Wm. Wrigley Jr. Co. v. Swerve IP, LLC*, 900 F. Supp. 2d 794, 803 (N.D. Ill. 2012) (Leinenweber, J.) (trademark); *Vienna Beef, Ltd. v. Red Hot Chicago, Inc.*, 833 F. Supp. 2d 870, 876 (N.D. Ill. 2011) (Coleman, J.) (false advertising); *Lettuce Entertain You Enter., Inc. v. Leila Sophia AR, LLC*, 703 F. Supp. 2d 777, 782 (N.D. Ill. 2010) (Lefkow, J.) (trademark); *Miyano Mach. USA, Inc. v. MiyanoHitec Mach., Inc.*, 576 F. Supp. 2d 868, 874 (N.D. Ill. 2008) (Kendall, J.) (trademark).

[21] ECRM argues that it has voluntarily ceased using the data coverage slide in its marketing, but voluntary cessation is not enough to moot the issue. *See Flava Works*, 689 F.3d at 762 (holding that "cessation of an unlawful practice" does not moot a preliminary injunction motion).

quality and the quantity of data coverage, a factor that is important to customer decisions on whether to purchase Market Track's or ECRM's product. In fact, data coverage is precisely where Market Track believes itself to hold a competitive advantage over ECRM. *See* ECRM Ex. 11, at 5 ("MT's coverage is better; however, ECRM is catching up"). ECRM is entitled to lawfully compete in ways that highlight its own advantages—what ECRM is not entitled to do is to falsely disparage its competition in advertising. Therefore, in the context of this market for ad tracking services, the Court concludes that the data coverage slide is likely to result in irreparable injury to Market Track's reputation and customer goodwill. Further, because harm to reputation or goodwill cannot be adequately remedied by payment of damages, there is no adequate remedy at law.

The balance of hardships and the public interest also weigh in favor of issuing an injunction. ECRM has voluntarily ceased using the offending slide, so an injunction against false comparisons of data coverage would be an insignificant burden on ECRM, because ECRM would still remain free to continue to operate its core business and to advertise its other perceived advantages over Market Track. *Cf. Abbott Labs.*, 971 F.2d at 19 (instructing the trial court to fashion preliminary relief that would not be "fatal" to a market participant). Further, ECRM has no right to make false statements in its advertising, and enjoining it from engaging in unlawful behavior is no hardship at all. Finally, the public interest in truthful advertising would be served by an injunction. *See id.* The Court finds that all four preliminary injunction factors— likelihood of success, irreparable harm, the balance of hardships, and the public interest—all weigh in favor of granting Market Track a preliminary injunction on its false advertising claim.

*       *       *

For the reasons set forth above, the Court finds that all the claims of U.S. Patent No. 7,849,083 are invalid, and accordingly enters judgment on Count I for ECRM. The Court denies Market Track's motion for a preliminary injunction as to the conduct alleged to constitute patent infringement or tortious interference with its customer contracts, but grants the motion to the extent that it seeks an injunction barring the use of the offending coverage slide, or any substantially similar graphics, in its communications with customers or potential customers.

Dated: June 12, 2015

John J. Tharp, Jr.
United States District Judge